GEORGE W. PHILLIPS, administrator, *vs.* COUNTY OF MIDDLESEX.

Middlesex.   Jan. 7. — July 25, 1879.   COLT & ENDICOTT, JJ., absent.

On a petition for damages for the taking down of a dam in 1871, under the power given by the St. of 1869, *c.* 378, to secure proper drainage and to abate a nuisance, it appeared that, before 1870, the power at the dam had been supplied by the waters of a pond and of another body of water; that, in 1870, the waters of the pond had been taken under legislative authority. The petitioner put in evidence to show that the water-power was still of value after the waters of the pond were taken; and offered evidence of the actual expense of setting up a steam-engine with the necessary buildings and fixtures to supply the power lost by the taking of the pond; and what power the engine gave. *Held,* that the evidence was properly excluded. *Held, also,* that evidence of a lease of the premises and of the rent reserved therein, before the taking of the waters of the pond, was properly excluded. *Held, also,* that a question to a witness, — who testified that he had a mill on the same stream, a short distance below that of the petitioner, and was engaged in the same business, and that, after the waters of the pond were taken, he obtained the same supply, from an aqueduct company, — as to what it cost him to use the waters of the pond, before they were taken, for the same time that he had used the water of the aqueduct company, was rightly excluded.

An admission made by an administrator in one case is competent evidence against him at the trial of another case.

PETITION for a sheriff's jury to assess the damages sustained by David Dyer, the petitioner's intestate, by reason of the taking down of his dam in Malden, by the county commissioners of Middlesex acting under the St. of 1869, *c.* 378.*

At the trial, it appeared that Dyer was, in March 1871, the time the dam was taken down, the owner, and in possession thereof, and of a mill site connected therewith ; that the power at this dam, prior to July 1870, had been supplied by the waters of Spot Pond and by the waters of Ell Pond and certain meadows, all which, after uniting in one stream, came down to his dam, immediately above which was a pond of some two acres, owned by Dyer, with a right of flowage of a large tract of meadows above it; and that in July 1870, the waters of Spot Pond were taken, for the use of certain towns, under the authority conferred by the Sts. of 1867, *c.* 208, and 1870, *c.* 160, and thereafter diverted, so that Dyer no longer had the use of them as he had before that time, though the water commissioners, during the summer of 1870, did, at the request of the owner of a mill below the Dyer Dam, hoist the gate at different times, and let down the water from Spot Pond to the mill.

It further appeared that on Dyer's mill site, and used in connection with the water-power, were a brick and several wooden buildings; that the brick building and its machinery were more or less damaged by fire in November 1870 ; that no use of any of the buildings or of the power was made after the fire, and that at the time of the taking down of the dam, there was no machinery there, and the place was abandoned for mill business.

The petitioner contended, and there was evidence tending to show, that, notwithstanding the loss of the waters of Spot Pond, so long as the dam at Malden remained, there was, with the pond and right of flowage above, a valuable power left, which could

---

* This act authorizes the county commissioners of Middlesex to take " such land, water-courses and water-rights, dams and other real estate, or interests, or easements, or rights therein, on or adjoining the streams or brooks running from Ell Pond in Melrose and Spot Pond in Stoneham to the tide-water in Malden, as they shall deem necessary for the purposes of proper drainage and the public health; " and provides that, if any person shall sustain damages to his property by reason thereof, the same shall be assessed as provided by law for the assessment of damages in the laying out of highways.

be used to profit, and also that the water from the mill pond at the dam was valuable for washing, cleansing and dyeing, until the destruction of the dam. It appeared that while Spot Pond made a part of the water supply there was a dam at that pond, of the gate at the outlet of which Dyer had the absolute control; and there was evidence on the part of the petitioner tending to show that, prior to the taking of Spot Pond in 1870, for eight months in the year the gate was not hoisted; that a certain amount of power could be had for the works at Malden without resorting to that reservoir, and that only for the remaining four months was it necessary to draw upon this pond, and that a power lasting for eight months in the year, as near to Boston as this one, was worth two thirds as much as the same amount of power continued through the year would be.

The respondent contended, and there was evidence tending to show, that, after the taking of the water of Spot Pond in 1870, there was no water power of any value left; that by the fire in November 1870, the brick building and machinery therein were substantially destroyed, and that there was no water power remaining which would make it profitable to erect buildings and put in machinery to carry on a mill at this place; that the water remaining after the diversion of Spot Pond, coming from Ell Pond and the meadows, was impure and unfit for cleansing and dyeing; and that at the Dyer Dam they were dependent on the water of Spot Pond to run the mills the year round; and that, when that pond ceased to overflow, they always hoisted the gates for a supply for the mills, and that, without Spot Pond, there was no water power which could be made use of; that the maintenance of the dam, flowing the meadows in the spring of the year, created a public nuisance prejudicial to the public health, and that for that reason it was necessary to abate it; that by the removal of the dam and drawing off of the water, the value of the land of the petitioner's intestate was greatly enhanced, and that he received a benefit rather than damage by the removal of his dam.

The presiding officer ruled, without objection, that the measure of damages was the difference in the market value of the estate as it existed at and just before the taking, and as it existed immediately after the taking, regarding the work completed.

Charles E. Parsons, a witness for the petitioner, who had built water and steam mills in different places, and who was qualified as an expert in the creation, use and value of water and steam power, testified that he was once an owner of this whole property, and, after selling the same to Dyer in 1855, was an occupant, and then lessee under him, of part of the same, and as such carried on work there before the taking of Spot Pond, and at and after the actual taking until the fire in November 1870. The witness gave his estimate of the power at Malden before Spot Pond was taken and after that event, and stated that after Spot Pond was taken he supplemented the power lost thereby by putting in a steam-boiler and engine, and erecting the necessary building therefor. The petitioner then proposed to ask him the following questions: "What power did this steam-engine give?" "At what cost were the engine and boiler put in and the buildings erected?" The presiding officer refused to allow these questions to be put. The witness was permitted to testify as to the whole power before the taking of Spot Pond, and as to the amount of power which remained after the taking of Spot Pond, and at the time of the taking down of the dam; also, to testify as to the value of the power at and just before the time of the taking, and which was destroyed by the removal of the dam; and also, as an expert, as to the use which could be made of the power at the time of the taking down of the dam, and what it would yield.

There was evidence that, before the taking of Spot Pond, the water coming from the pond at the dam in Malden was remarkably pure and well suited for washing, cleansing wool and dyeing; that, after the taking down of the dam, the water flowing down the stream through Dyer's premises was no longer fit for such uses. The evidence was conflicting on the question, whether the water, after the diversion of Spot Pond and before the taking down of the dam and destruction of the pond above it, was any longer fit for such uses.

John Cochrane, Jr., a witness for petitioner, who was a dyer, bleacher and printer of fabrics, long practised in his calling, occupied under a written lease for two years ending in 1870, at a certain rent reserved therein, made in 1868, before the loss of the water of Spot Pond, a wooden building on the premises,

which was not damaged by the fire, with a right to use the water, not for power, but for his special purpose, through a four-inch pipe therein, for ten hours a day. The petitioner offered in evidence this lease and to show the rent therein reserved, which had been paid. The presiding officer excluded the evidence. The witness afterwards testified, that he leased the place in 1868, for two years, to help out his mill at Medford, and to enable him to fulfil a special contract he had, and to get Spot Pond water, which water he regarded as very pure; that while he was there he had seen no difference in the water in the summer and winter, and that he would not have leased it in 1871; that he had not tried the water without Spot Pond water.

Augustus L. Barrett, a witness for petitioner, who was the superintendent of bleaching and dyeing mills in Malden, about three hundred feet distant on the same stream below Dyer, testified, that, after the taking of Spot Pond, he had taken at his establishment, through the service pipes at Malden, for one year, the necessary supply for the uses at his mill, as he had been accustomed to have from the stream before the taking of said pond; that the same had been delivered on two floors through pipes, whereas in the supply from the stream they had the water only on the lower floor. The petitioner then proposed to ask the witness this question, " What did it cost you to use the same quantity of Spot Pond water for one year, that you had formerly from the stream below the Dyer Dam?" The presiding officer refused to allow the question to be put. The witness was however permitted to testify as to the value of the water privilege at the Dyer Dam at the time of its removal in 1871, embracing all the purposes for which it could be used.

The petitioner in this case was also the petitioner to prosecute a suit before a sheriff's jury, against the towns of Malden, Melrose and Medford, for the assessment of his intestate's damages, at the same mill power, by the taking of the waters of Spot Pond, and at the trial in that suit opened his case in his own behalf to the jury. The respondent was allowed, against the petitioner's objection, to put in evidence, that, in his opening in that case, he said to the jury, that Spot Pond was the material part of the power, and what was left was substantially worthless.

The jury returned a verdict that the petitioner had sustained

no damage by the taking òf the dam. The verdict was returned to, and accepted by, the Superior Court; and the petitioner appealed to this court.

*H. W. Paine & G. W. Phillips*, for the petitioner.

*E. R. Hoar*, (*C. P. Judd, B. F. Hayes, & F. S. Hesseltine*, with him,) for the respondent.

AMES, J. The claim of the petitioner was for damage done by the removal of the dam in March 1871, and the consequent loss or diminution of such water-rights as remained to his intestate after the waters of Spot Pond had been withdrawn and had ceased to furnish any part of the water supply at the dam. The witnesses called by the petitioner had been allowed to testify as to the value of the privilege at the dam at the time of its removal, " embracing all the purposes for which it could be used." The questions as to the actual expense of setting up a steam-engine with the necessary buildings and fixtures for the purpose of "supplementing" the power lost by the taking of Spot Pond, and what amount of power the steam-engine gave, were properly excluded. Whatever answer could have been given that would have been properly responsive to those questions could have furnished only an indirect and circuitous, as well as uncertain, mode of estimating the amount of power remaining. What it had cost to substitute other power in place of what had been lost, and what amount of power had been in fact so substituted, would throw but little light upon the question as to the amount of power furnished by the dam after the taking of Spot Pond. In the exercise of his judicial discretion, the presiding officer might lawfully exclude the proposed evidence, for that reason.

The evidence offered as to the lease to Cochrane and the rent which he paid was irrelevant, and was properly excluded. His lease was given, and his term had expired, before the waters of Spot Pond were withdrawn. The witness was allowed to testify as to the value of the use of the water in 1871, in the mode and upon the terms upon which he used it before that time, viz. for bleaching and dyeing purposes, and assuming it to be of the same quality. We do not see any way in which that lease and the rent reserved under it could throw any additional light upon the question as to the value of the privilege for such uses, without Spot Pond.

The witness, Barrett, had testified that, after the taking of Spot Pond, the town of Malden had furnished through service pipes the necessary supply of water at his bleaching and dyeing establishment, delivered on two floors. He was then asked what it had cost him to use the same quantity of Spot Pond water for one year that he had formerly from the stream below the dam. We fail to see how any answer to this inquiry could be material to the question as to the value of any water-rights affected by the removal of the dam, after the Spot Pond waters had been excluded.

With regard to the remaining point, we do nòt find it necessary on this occasion to consider the question to what extent and under what precise circumstances the declarations of counsel are to be considered as binding upon their clients in the way of admissions. The previous statements in the present case were not made by an attorney in behalf of a client, but by the petitioner himself, in his own cause and on his own behalf, and were admissible as such under the general rule. As he was a party of record, it is immaterial that he was acting in a representative capacity. *Faunce* v. *Gray*, 21 Pick. 243.

*Judgment affirmed.*