JOHN CAVANAGH & another *vs.* CITY OF BOSTON.

Suffolk.    March 10. — June 19, 1885.    W. ALLEN, COLBURN, & HOLMES, JJ., absent.

In the absence of statutory authority, neither the board of health nor the city council of a city has any power to erect a dam on a person's land, without his consent, for the purpose of abating a nuisance existing on adjacent land.

A city is not responsible for damages resulting from work done under the supposed authority of illegal and void votes of the city council; and it is immaterial that the work was done in a negligent manner.

TORT for injuries occasioned by the construction of a dam across South Bay, in Boston.   At the trial in the Superior Court, before *Staples*, J., the plaintiffs' evidence tended to show the following facts:

At the time of the acts complained of, the plaintiffs were, and have ever since been, the owners in fee of the northerly half of Wales Island and the flats adjacent thereto, situated in said South Bay.

At a meeting of the common council of the city of Boston, held on June 3, 1880, the following order was passed: " Ordered, That the board of health be requested to cause to be abated the nuisance at present existing in the South Bay, east of the New York and New England Railroad, and the expense attending the same to be charged to the appropriation for health."

At a meeting of the board of aldermen of said city, held June 10, 1880, the said order was referred to the committee on health, in concurrence with the vote of said council, passed June 3, aforesaid.   At a meeting of said board of aldermen, held July 6, 1880, the eighth annual report of the board of health of the city of Boston, dated May 1, 1880, made as provided in the Public Statutes, was received and sent down; and at a meeting of the common council, held July 8, 1880, said report was placed on file.   This report, among other matters referred to, contained the following:

" The flats between Dorchester Avenue and the New York and New England Railroad, near Washington Village, are left bare at low tide, and are a source of very offensive odors.   The deposit from sewers, and the unclean filling which takes place

more or less each year, add very much to their offensive condition. Each year since complaints have been made, the board of health have added clean gravel to cover the worst part of the nuisance, and with good effect; but to remedy the whole evil would involve an expenditure of money too large for the appropriation of this department. If the whole of those flats above the Norway Iron Works could be kept covered with water to a depth of two feet by means of a dam, we think that all reasonable complaints would subside; but, so far as we have been able to ascertain from good authority, the great cost of the dam and the risk of damage to adjoining structures would not justify us in the attempt. Clean gravel and deep water alone will effectually abate the nuisance which must till then continue to arise from such filthy mud. A plan is now under advisement by the joint committee on health, by which it is hoped that an inexpensive dam can be built from the rear of the Norway Iron Works on Dorchester Avenue to the New York and New England Railroad, and which would keep the flats covered at all times."

At a meeting of the common council of said city, held March 29, 1880, the following petition, signed by Daniel J. Cross and others, was presented: "To the city council of the city of Boston: We the undersigned respectfully represent that a portion of South Bay, lying between Dorchester Avenue and the New York and New England Railroad, has become an intolerable nuisance; we therefore request your honorable body that you will take immediate action to abate said nuisance by flowage or otherwise."

At a meeting of said common council, held July 12, 1880, said committee on health, to whom was referred the petition of said Cross, reported thereon, that the subject had been duly considered and by them referred to a sub-committee, which had consulted the city engineer, who submitted a statement that a temporary dam as high as grade 5, city base, could be built, which would flood to a depth of two feet, and the estimated cost of which would be $4600; and the committee recommended the passage of the accompanying preamble and order: "Whereas, the board of health has declared a nuisance exists, consisting of offensive flats on the territory between the track of the New

York and New England Railroad Company and Dorchester Avenue, which can be abated by the construction of a dam at an estimated cost of $4600, and as the annual appropriation granted to said board does not contemplate such an expenditure, it is hereby ordered, that the committee on finance be directed to furnish the means for the abatement of the aforesaid nuisance." This report was accepted, and the said order passed by both branches of said city government.

At a meeting of the board of aldermen, held July 26, 1880, the following report was submitted by the committee of finance of said board: " South Bay Nuisance. The committee on finance to whom was referred the report of the committee on health, covering an order that this committee furnish the means for the abatement of the nuisance existing on the territory between the track of the New York and New England Railroad and Dorchester Avenue, would respectfully report the accompanying order granting the request: ' Ordered, that the auditor of accounts be and he hereby is authorized to transfer from the reserved fund the sum of $4600, and that said sum constitute a special appropriation for the purpose of constructing a temporary dam across South Bay, between the New York and New England Railroad track and Dorchester Avenue, for the abatement of the nuisance on the flats therein located; and that the board of health is hereby authorized to have said temporary dam constructed at an expense not exceeding the sum herein provided.' " This order was passed.

At a meeting of the common council, held July 29, 1880, said report and order for a transfer of $4600 from the reserved fund for the construction of a temporary dam across South Bay, between the New York and New England Railroad track and Dorchester Avenue, for the abatement of a nuisance, was passed in concurrence.

At a meeting of the common council, held September 23, 1880, it was ordered that the committee on health be requested to report to the city council why the nuisance existing in the South Bay has not been abated, an order having been passed and the money appropriated for the same, July 29. This order of September 23 was passed by the common council, and by the board of aldermen in concurrence.

At a meeting of the board of aldermen, held November 1, 1880, said joint committee on health reported that "no further action is required on the order to abate a nuisance on South Bay, said nuisance now being abated;" which report was accepted, and the same was sent down to the common council. At the last-named meeting of the board of aldermen, the committee on health reported on said order of inquiry respecting the nuisance on South Bay flats, "that the cause of delay in abatement of the nuisance was unavoidable. The work is now progressing and will be completed in a few days." This order was likewise accepted and sent down to said council. At a meeting of said council, held November 4, 1880, both the last-named reports were accepted in concurrence.

All of the foregoing orders were duly approved by the mayor of said city. On September 8, 1880, Henry M. Wightman, the city engineer of Boston, presented a petition to the board of harbor commissioners of the Commonwealth, for a license "for the construction of a temporary dam in the South Bay from the New York and New England Railroad embankment to Wales Island, so called, . . . . for the purpose of abating a nuisance existing in that portion of the South Bay south of the dam." Said board thereupon granted the license.

On or about September 15, 1880, workmen, acting under the direction of Henry M. Wightman, who was at this time city engineer, constructed the dam in question, in accordance with the license of the harbor commissioners, and the cost of building the dam was paid for out of said appropriation. The easterly portion of said dam was built across the flats, and upon a part of the portion of the island owned by the plaintiffs, by driving piles and pile-sheeting into the flats and island, and with gates in the part known as Pine Island Channel, which adjoined said flats. By reason of the omission properly to ballast said dam, said gates were washed away, and the dam was weakened. After this occurred, a large amount of stones and slag were strewn upon the flats along both sides of said dam, and a quantity of larger stones were put into the space in Pine Island Channel, which was left open by the washing away of the gates. Said dam was not securely built, and the water has since the erection of the dam gradually undermined the same, and is now

flowing out in large quantities underneath the dam, and washing away the bottom of the flats of the plaintiffs. By reason of the confinement of the waters of South Bay by said dam, there has been carried away by the rushing of said water by and over the easterly end of said dam, a large portion of the island owned by the plaintiffs; and this washing away might have been prevented by the building of the dam higher at that end of the island. The tide ebbs and flows in South Bay and about said island; and, before the erection of this dam, the plaintiffs used the island for keeping and storing piles and other timber owned by them, partly together and in part separately; and such use has been to a large extent prevented, the approach to the island from the harbor of said city has been obstructed, and the free flow of water about the island has been almost stopped.

The nuisance complained of existed on flats in said bay south of the plaintiffs' flats and away from them, and no nuisance existed on the plaintiffs' flats.

The charter of the city of Boston, St. 1854, c. 448, provides in § 40 as follows: "All the power and authority now by law vested in the city council, or in the board of mayor and aldermen, relative to the public health, and the quarantine of vessels, shall continue to be vested in the city council, to be carried into execution by the appointment of one or more health commissioners; or in such other manner as the health, cleanliness, comfort, and order of the city may, in their judgment, require, subject to such alterations as the Legislature may from time to time adopt. The powers and duties above named may be exercised and carried into effect by the city council in any manner which they may prescribe, or through the agency of any persons to whom they may delegate the same, notwithstanding a personal exercise of the same, collectively or individually, is prescribed by previous legislation; and the city council may constitute either branch, or any committee of their number, whether joint or separate, the board of health for all or for particular purposes."

The ordinances of the city of Boston relating to said board of health are as follows:

"Section 1. Of the Ordinances on Health. It shall be the duty of the mayor to be vigilant and active in protecting the public health; to see that the laws and ordinances in relation to

the same are enforced; to communicate his views to the board of health or the city council from time to time, as he may deem expedient; and he shall have power to call upon the police and the various city officers to aid him in the performance of these duties.

"Section 2. Committee on Health. There shall be appointed annually in the month of January a joint committee of the city council on the health department, consisting of two aldermen and three councilmen. It shall be the duty of said committee to examine as often as once in each month the records and accounts of the board of health; and also to examine all applications for appropriations for the health department, and report thereon to the city council."

"Section 5. Board of Health. In the month of November, in the year 1872, or as soon thereafter as may be, the mayor shall appoint, subject to the approval and confirmation of the city council, three persons not members of the city council, who shall constitute the board of health of the city of Boston. The persons so appointed shall enter upon the duties of their office forthwith, etc. The members of said board shall at all times be subject to removal by the mayor for cause. For their services they shall receive such compensation as the city council may from time to time determine."

"Section 7. The board of health, as hereby constituted, shall have and exercise all the powers vested in, and shall perform all the duties prescribed to, the city council or the board of aldermen as a board of health, under the statutes and ordinances now in force; and shall have power to appoint such subordinate officers, agents, and assistants in addition to those hereinafter designated as they deem necessary, and may fix their compensation and the compensation of the clerk before mentioned, provided that the whole amonnt of such compensation shall not exceed the sum appropriated therefor by the city council."

"Section 9. The said board of health shall annually, in the month of May or June, present to the city council a report made up to and including the thirtieth day of the preceding April, containing a full and comprehensive statement of the acts of the board during the year, and a review of the sanitary condition of the city."

The ordinances and votes of said city relating to the office of said city engineer are as follows:

" Section 2.   There shall be chosen annually on the first Monday of February, or within sixty days thereafter, by concurrent vote of the two branches of the city council, a city engineer, who shall be a citizen of Boston.   He shall hold his office for one year from the first Monday of April in the year in which he shall be elected, unless sooner removed; he may be removed at the pleasure of the city council, and vacancies may be filled at any time for the unexpired term.   He shall receive such compensation as the city council may from time to time determine.

" Section 3.   Said engineer shall perform all such services for the city of Boston as properly come under the direction of a civil engineer, and shall be consulted on all important matters relating to public improvements of every kind where the advice of an engineer would be of service.   He shall take charge of all such structures and public works of the city as the city council, or any committee of the city council, or of either branch, may direct; and under their direction he shall prepare all plans and specifications for such structures, and shall prepare or cause to be prepared under their direction all contracts for the same.   He shall measure, or cause to be measured, when required by any committee of the city council or of either branch thereof, all work done by contract for the city, and shall certify the same.   He shall be the custodian of all city plans belonging to his department."

The defendant put in evidence the following record of the board of health of said city of Boston:

" At a meeting of the board of health, held September 6, 1880, voted:  Whereas this board doth adjudge the flats in South Bay, lying northwesterly of Dorchester Avenue and between said avenue and the track of the New York and New England Railroad, when uncovered, a nuisance, the source of offensive odors and exhalations injurious to the public health and comfort, therefore, ordered, that the city engineer be requested to abate said nuisance by erecting a dam from the northwesterly side of island in the rear of Samuel H. L. Pierce's lumber and planing mill to the track of said New York and New England Railroad, according to a plan submitted by said engineer, at an expense not exceeding forty-six hundred dollars."

The defendant further offered in evidence the following letter, written and sent, on September 6, 1880, by the clerk of said board of health to the city engineer : " At a meeting of the board of health this day, it was voted to request the city engineer to abate a nuisance on Dorchester Avenue, by erecting a dam from the northwesterly side of an island in the rear of Samuel H. L. Pierce's lumber and planing mill to the track of the New York and New England Railroad, according to a plan submitted by you, at an expense not exceeding forty-six hundred dollars."

To the admission of this order and letter the plaintiffs objected.

It appeared that there was no other dam save the one in question to which the acts and proceedings aforesaid, as shown by the evidence on both sides, could relate.

The defendant then put in evidence, without objection, the bills for building said dam.

This was all the evidence in the case material to the question of liability. The judge ruled that the action could not be maintained ; and directed a verdict for the defendant. The plaintiffs alleged exceptions.

*W. E. L. Dillaway*, for the plaintiffs.

*T. M. Babson*, for the defendant.

C. ALLEN, J. The difficulty with the plaintiffs' case is, that neither the board of health nor the city government had any authority to abate the nuisance in the manner which was adopted. That manner was by the erection of a dam, the easterly portion of which was built across the flats and upon the upland of the plaintiffs, for the purpose of raising the water so as to flow over other flats away from the flats of the plaintiffs ; the plaintiffs' evidence tending to show that no nuisance existed on their own flats. This was an occupation of the plaintiffs' land which the city had no power to make, without the plaintiffs' consent. No statute conferred the power of appropriating the plaintiffs' property for public uses, nor provided compensation to them for damages sustained by such appropriation. When the preservation of the public health has been thought to require such acts as the filling of land, or raising its grade, over a considerable extent of territory, or the covering

of land with water, or the removal of dams from streams, in order to allow better drainage or to prevent the accumulation of offensive materials, it has been usual to pass statutes giving the requisite authority, and making due provision for the protection of the property of individuals. Instances of such legislation may be found in the St. of 1867, c. 308, authorizing the city of Boston to take certain lands in the Church Street district, so called, which was before this court for consideration in *Dingley* v. *Boston*, 100 Mass. 544, and in *Cobb* v. *Boston*, 109 Mass. 438, and 112 Mass. 181; in the St. of 1869, c. 378, authorizing the county commissioners of Middlesex county to remove all dams on certain streams, for the purpose of securing proper drainage in certain towns, which was under consideration in *Phillips* v. *County Commissioners*, 122 Mass. 258, and in *Phillips* v. *Middlesex*, 127 Mass. 262; in the St. of 1872, c. 299, where the cities of Cambridge and Somerville were authorized to raise certain low lands to a proper level, which was before the court in *Cambridge* v. *Munroe*, 126 Mass. 496, *Bancroft* v. *Cambridge*, 126 Mass. 438, and *Read* v. *Cambridge*, 126 Mass. 427; and in the St. of 1873, c. 340, providing for the filling of lands in the Northampton Street district, so called, in Boston, which was considered in *Farnsworth* v. *Boston*, 121 Mass. 173.

The general power vested in boards of health and in city governments is not adequate to dealing with such cases, if it is impossible to come to an agreement with the owners of property to be affected. There is no general statute vesting in these bodies the right of eminent domain, or making provision for the compensation of persons whose property may be taken. The general phrases contained in the city ordinances, which have been referred to, authorizing the city council to exercise the powers vested in them for the preservation of the public health in any manner which they may prescribe, cannot be held to give them authority to take private property for public uses. No such power existed in the body which enacted the city ordinances. In the present case, the acts of which the plaintiffs complain amount to an occupation of their land for the purpose of building a dam thereon in such a manner that clearly it was an appropriation of the land to a public use. It was not a mere transient entry and occupation, though the dam was styled

temporary ; but there was a substantial and practically exclusive occupation of a portion of the plaintiffs' land. Such an act was clearly illegal. It does not fall within the principle upon which a brief or momentary occupation of private lands is sometimes justified through necessity, as, for example, for the purpose of making an arrest, or of the perambulation of the boundaries of towns by the selectmen, or of ascertaining boundaries for public purposes. *Winslow* v. *Gifford*, 6 Cush. 327.

The present case is a much stronger one than *Brigham* v. *Edmands*, 7 Gray, 359, where a verdict was sustained against the commander of a division of the militia, as a trespasser, for holding the annual encampment provided for by law upon private lands, without the owner's consent. See also *Baker* v. *Boston*, 12 Pick. 184, 194. No doubt the plaintiffs might have obtained an injunction to restrain the prosecution of the work, if they had sought their remedy in that form. *Boston Water Power Co.* v. *Boston & Worcester Railroad*, 16 Pick. 512, 525.

The acts done having been beyond the authority and power of the city to do, the city cannot be held responsible in damages for what was done under the supposed authority of illegal and void votes. *Spring* v. *Hyde Park*, 137 Mass. 554. *Lemon* v. *Newton*, 134 Mass. 476. *Cushing* v. *Bedford*, 125 Mass. 526. But the liability, if any, rests upon the individuals who performed those acts, as in *Brigham* v. *Edmands, ubi supra.*

The plaintiffs seek to avoid this result by urging that a part of the damage came from the negligent construction of the dam. But since it was an illegal act to build it at all, it is not apparent how negligence in the trespassers can entail a responsibility on the city.                *Exceptions overruled.*