## CAUSBY et ux. v. UNITED STATES.
### No. 46054.

Court of Claims.
June 4, 1945.

William E. Comer, of Greensboro, N. C., for plaintiff.

Mary K. Fagan, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

WHITAKER, Judge.

Plaintiffs sue for the alleged taking by the defendant of their home and chicken farm which was adjacent to the Greensboro-High Point Municipal Airport. This airport was operated under an enabling Act of the North Carolina Legislature. It was used by commercial airliners, by private planes, and by military aircraft. The defendant used it under a lease which permitted its military airplanes to land on and take off from it, and to use one of the hangars on it and to have the exclusive use of 10 acres of land adjoining the hangar.

One of the runways on which the planes landed and took off ran in the direction of plaintiffs' home and chicken farm, so that planes using this runway passed directly over plaintiffs' property. All planes, both private and military, used this runway when the wind was blowing from a certain quarter.

Plaintiffs say that most of the planes using it passed over their house harmlessly at relatively high altitudes, but that the heavier of the military planes passed over it at so low an altitude as to seriously interfere with their possession and enjoyment of their property. They say that the chickens on their chicken farm lived in such a state of fright that their fertility was greatly decreased, and that on frequent occasions they became so frightened that they blindly flew against the buildings and were killed. As a result they say they have had to sell their remaining chickens and abandon their property as a chicken farm. They also say that they themselves live in a state of constant uneasiness and that they are unable to sleep at night due to the noise of the planes passing over their house and to the glare of their lights. They continue, however, to occupy the property as a home.

The proof shows that plaintiffs' barn is 2,220 feet from the end of the paved portion of the northwest-southeast runway, the tallest tree is 2,230 feet from it, and plaintiffs' house is 2,275 feet from it. The elevation of plaintiffs' property is from five to six feet below that of the runway.

According to the rules and regulations of the Civil Aeronautics Authority, the ideal glide angle is not less than 30 to 1. This means that there must be no obstruction more than a foot high 30 feet from the end of the runway, and that the height of any obstruction must not exceed 1/30 of its distance from the end of the runway. This angle of glide is supposed to be safe under the worst conditions. The highest tree on plaintiffs' property is 18 feet below this glide angle, plaintiffs' barn is 63 feet below it, and plaintiffs' house is 67 feet below it. Not infrequently defendant's planes passed over plaintiffs' property at approximately these heights. On some occasions the backwash from the propellers blew the dead leaves off the trees.

Plaintiffs' testimony that the fertility of their chickens was so decreased, and that so many of them were killed as a result of fright that their business became so unprofitable that they had to abandon it, is not disputed; nor that the value of the property has greatly decreased. Nor is it disputed that all planes used the runway which passed over plaintiffs' property when the wind was blowing from a certain direction, nor that the defendant intended to continue to do so as long as it continued to use the airport. The defendant does say that this runway was used only from 4 to 7 percent of the time, but it does not deny that it intended to continue to use it whenever the wind blew from a certain quarter, so long as it continued to use the airport.

The term of the lease began on June 1, 1942, and ran for a period of thirty days, but with the privilege of renewal until June 30, 1967, or until six months after the end of the present national emergency, whichever date was the earlier. It is still in force and defendant continues to use the airport.

The question is whether or not the passage of defendant's planes over plaintiffs' property at the stated heights above it, with the result stated, and its intention to continue to have them pass over it for an indefinite period, constitutes a taking.

Under the old common law doctrine of cujus est solum ejus est usque ad coelum et ad inferos a landowner not only owns the surface of his land, but also owns all that lies beneath the surface even to the bowels of the earth and all the air space above it even unto the periphery of the sky.

Under this doctrine any erection over the land of another, or any passage through the air space above it, is a trespass. So, if an adjoining landowner allows the eaves of his house to extend beyond his own property and over the land of another he has committed a trespass. Broom's Legal Maxims, 310; Crowhurst v. Amersham Burial Board, 4 Ex.D. 5, 10; Ackerman et al. v. Ellis, 81 N.J.L. 1, 79 A. 883. A telephone or telegraph company which stretches its wires over the land of another without permission is guilty of a trespass. Butler v. Frontier Telephone Co., 186 N.Y. 486, 491, 79 N.E. 716, 11 L.R.A.,N.S., 920, 116 Am.St.Rep. 563, 9 Ann.Cas. 858. The shooting of guns over another's land is also a trespass, although the bullets do not land upon it. Whittaker v. Stangvick et al., 100 Minn. 386, 111 N.W. 295, 10 L.R.A., N.S., 921, 117 Am.St.Rep. 703, 10 Ann.Cas. 528; Restatement of the Law of Torts, sec. 159.

However, especially since the days of airplanes, this common law doctrine has received substantial modification. But even so, there can be no doubt that today a landowner owns the air space above his land as completely as he does the land itself or the minerals beneath it, at least insofar as it is necessary for his full and complete enjoyment of the land itself. So, he may erect buildings on his land to any desired depth or height, subject, of course, to necessary police regulations, and, subject, of course, to the right of eminent domain, he may prohibit the erection over it of any structures of any character or the passage over it of anything that interferes with his right to light, air, view, or the safe and peaceful occupation and enjoyment of his land. Smith v. New England Aircraft Co., 270 Mass. 511, 170 N.E. 385, 69 A.L.R. 300; Delta Air Corporation v. Kersey, 193 Ga. 862, 20 S.E. 2d 245, 140 A.L.R 1352; Restatement of the Law of Torts, sec. 194; Pollock on Torts, 13th Ed., p. 362; Burdick's Law of Torts, 4th Ed. 406; Act of May 20, 1926, c. 344, 44 Stat. 568, 574, sec. 10; 49 U.S.C. 180. Cf. Northwest Airlines v. Minnesota, 322 U.S. 292, 64 S.Ct. 950, 88 L.Ed. 1283; Hinman et al. v. Pacific Air Transport Corporation, 9 Cir., 84 F.2d 755.

Under the facts of this case there can be no doubt that defendant has committed numerous trespasses upon plaintiffs' property. It has traversed many times the air space above their property at such an altitude and with planes of such a character as to seriously interfere with plaintiffs' use

and enjoyment of their property, even to such an extent as to make it necessary for them to abandon it as a chicken farm.

A trespass upon the property of another, however, does not ordinarily constitute a taking, but if it is sufficiently frequent or if there is otherwise shown an intention to continue it at will, such continued trespasses or intention may amount to a taking, if they destroy the owner's use and enjoyment of his property. Hurley v. Kincaid, 285 U.S. 95, 103, 52 S.Ct. 267, 76 L.Ed. 637; Jacobs v. United States, 290 U.S. 13, 16, 54 S.Ct. 26, 78 L.Ed. 142, 96 A.L.R. 1; Portsmouth Harbor Land & Hotel Co. v. United States, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287.

The case last cited was before the Supreme Court on three different occasions. Its first opinion was in a case styled Peabody v. United States, 231 U.S. 530, 34 S. Ct. 159, 58 L.Ed. 351, its second in Portsmouth Harbor Land & Hotel Co. v. United States, 250 U.S. 1, 39 S.Ct. 399, 63 L.Ed. 809. Under the facts in the two former opinions the Supreme Court held that there had not been a taking. The case reported in 260 U.S. 327, 43 S.Ct. 135, 136, 67 L.Ed. 287, came before the court upon a demurrer which had been sustained by this court. The facts stated in the petition were that the defendant had erected a fort on a strip of land immediately to the west of plaintiff's land and that it had planted guns therein which could be fired only over plaintiff's land; that a fire control tower had been erected for the firing of these guns, and that the defendant intended to fire them across plaintiff's land at will, with the result that it had been deprived of the use and enjoyment of its property. Of such a case the court said:

"* * * There is no doubt that a serious loss has been inflicted upon the claimant, as the public has been frightened off the premises by the imminence of the guns; and while it is decided that that and the previously existing elements of actual harm do not create a cause of action, it was assumed in the first decision that—'If the Government had installed its battery, not simply as a means of defence in war, but with the purpose and effect of subordinating the strip of land between the battery and the sea to the right and privilege of the Government to fire projectiles directly across it for the purpose of practice or otherwise, whenever it saw fit, in time of peace, with the result of depriving the owner of its profitable use, the imposition of such a servitude would constitute an appropriation of property for which compensation should be made.' 231 U.S. 538, 34 S.Ct. 160, 58 L.Ed. 351. That proposition we regard as clearly sound. The question is whether the petition before us presents the case supposed.

\*       \*       \*       \*       \*

"If the United States, with the admitted intent to fire across the claimants' land at will should fire a single shot or put a fire control upon the land, it well might be that the taking of a right would be complete. But even when the intent thus to make use of the claimants' property is not admitted, while a single act may not be enough, a continuance of them in sufficient number and for a sufficient time may prove it. Every successive trespass adds to the force of the evidence. The establishment of a fire control is an indication of an abiding purpose. * * *"

The court held that the petition, alleging the facts set out above, did state a cause of action and our judgment sustaining the demurrer was reversed.

We think the case at bar is controlled by that case. In that case there had been no invasion of the land itself, and defendant had fired its guns across it but twice, but there was alleged an intention to fire over it at 'will, with the result that plaintiff had been deprived of its profitable use as a summer resort. Here there have been frequent invasions of the air space above plaintiffs' land, and the evidence shows an intention to continue these invasions whenever the wind blows in a certain direction. As a result plaintiffs have been deprived of the use of their property as a chicken farm.

In both cases, to paraphrase the Supreme Court's opinion in Peabody v. United States, supra, reiterated in Portsmouth Harbor Land & Hotel Co. v. United States, supra, a servitude has been imposed on the property which constitutes an appropriation of it. It was not a complete appropriation in either case, it is true. In both cases there was a taking only of the air space above plaintiffs' property, but this resulted in damage to the remainder of the property; and it is well settled that a plaintiff may recover not only the value of the part of his land which has been taken, but also the damage to the remainder resulting from the taking of a part of it. Bauman v. Ross, 167 U.S. 548, 574, 17 S.Ct. 966, 42 L.Ed. 270; United States v.

Grizzard, 219 U.S. 180, 31 S.Ct. 162, 55 L. Ed. 165, 31 L.R.A.,N.S., 1135.

■ But, it is said that in the case at bar the evidence indicates that the defendant did not intend to permanently appropriate to its own use this easement over plaintiffs' property since it reserved the right to renew its lease on the airport only until June 30, 1967, or six months after the end of the present national emergency, whichever date was earlier. Whether or not the defendant intended to appropriate unto itself a permanent or a temporary right to use the air space over plaintiffs' land, there was nevertheless a taking of it. A. W. Duckett & Co. v. United States, 266 U.S. 149, 45 S.Ct. 38, 69 L.Ed. 216; Brigham v. Edmands, 7 Gray, Mass., 359; McKeon v. New York, New Haven & Hartford Railroad Co., 75 Conn. 343, 53 A. 656, 61 L.R.A. 736, affirmed in a per curiam opinion in 189 U.S. 508, 23 S.Ct. 853, 47 L.Ed. 922; Cavanagh v. Boston, 139 Mass. 426, 1 N.E. 834, 52 Am.Rep. 716; Paine v. Savage, 126 Me. 121, 136 A. 664, 51 A.L.R. 1194; Steinhart v. Superior Court, 137 Cal. 575, 70 P. 629, 59 L.R.A. 404, 92 Am.St.Rep. 183; Cape Girardeau v. Hunze, 314 Mo. 438, 284 S.W. 471, 47 A.L.R. 25; Norwood v. Sheen, 126 Ohio St. 482, 186 N.E. 102, 87 A.L.R. 1375. All of these cases are authority for the proposition that there has been a taking within the meaning of provisions of a Constitution similar to the Federal Constitution entitling the owner to recover just compensation, although the taking is only temporary. Cf. United States v. General Motors Corporation, 323 U.S. 373, 65 S.Ct. 357.

■ But, we cannot conclude from the mere fact that the defendant reserved the right to renew its lease on the airport for a limited period, 25 years, or less if the national emergency did not last so long, that defendant intended to appropriate this easement unto itself only temporarily. Upon the expiration of its current lease on the airport defendant no doubt intended to make some sort of arrangement whereby it could use the airport for its military planes whenever it had occasion to do so. At any rate, it seems clear to us that the defendant asserted the right to have its planes fly over plaintiffs' property as low as the stated heights whenever it chose to do so. We, therefore, think that the defendant appropriated this easement unto itself permanently, not temporarily, and

that the plaintiffs are entitled to recover, if at all, on this basis.

■ The defendant also says that it is not liable because plaintiffs' land was taken, if at all, in the conduct of military operations in time of war, and for such a taking the defendant is not liable. This is quite clearly erroneous. The plaintiffs are entitled to recover under the constitutional provision that private property shall not be taken without just compensation. This provision has the same validity in time of war as in time of peace. The Constitution is not set aside in time of war. Indeed, the restraints of that instrument are especially necessary when our ordinary respect for the rights of others is often consumed in the hot fire of the passions aroused by war.

■ Plaintiffs are not entitled to recover for the damage to their business, but they are entitled to recover the special value of the land due to its adaptability for use for this business. Joslin Mfg. Co. v. Providence, 262 U.S. 668, 675, 43 S.Ct. 684, 67 L.Ed. 1167; Mitchell v. United States, 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644; Dominion Smelting & Refining Corp. v. United States, 102 C.Cls. 281.

From all the testimony, we have concluded that the value of the property destroyed and of the easement taken and the damage to plaintiffs' property resulting from the taking of this easement is the sum of $2,000.00. A judgment in the nature of a jury verdict will be rendered for this amount. It is so ordered.

WHALEY, Chief Justice, and LITTLETON, Judge, concur.

MADDEN, Judge (dissenting).

I am unable to agree with the decision of the court for several reasons.

*First.* The court awards the plaintiffs $2,000, one-half the value of their property. This award can be justified only by assuming that the activities of the Government which are the basis for this suit are to be carried on permanently. There is no basis in the evidence for such an assumption. The Government's lease on the airport is to terminate six months after the end of the present national emergency. When the lease terminates, the plaintiffs' property will be just as useful and just as valuable as it was before the Government

leased the airport in 1942. The plaintiffs will have their property, unimpaired, and also one-half of its value. Just compensation for a partial impairment of value for what will probably be about four years' use does not amount to one-half of the fee value of the property. After the Government has paid the judgment, it will have no way of recouping the money which it has been obliged to pay for a permanent right which it does not want and has no expectation of using. It will have nothing to sell, since the privilege of flying military planes at low altitudes over the plaintiffs' property could be of no use to anyone but the Government.

*Second.* I think that the Government has the right, at least in wartime, to have its military planes fly through the air space over a landowner's land, when the flights are at safe altitudes and are no more frequent than they were in this case. There is no question here of danger of physical contact with the plaintiffs' property. By recognized standards, the glide angles for even the heaviest of planes were such that they easily cleared the plaintiffs' buildings and trees. The Government's activities at the airport were conducted with great care, so that, in fact, the plaintiffs' property was no more subject to peril of physical contact than that of the countless persons throughout the country over whose homes planes fly at various heights. The harm to the plaintiffs' property resulted from the noise of planes, and, to a slight degree, from the lights of the occasional night flying planes. These annoyances are real, and may diminish the value of property. But all those whose property lies near a railroad, or a highway, or a street car line, suffer from these annoyances in varying degrees, and practically always without compensation, even though the owner of the annoying enterprise is a private or municipal corporation which is fully subject to suit.

When railroads were new, cattle in fields in sight and hearing of the trains were alarmed, thinking that the great moving objects would turn aside and harm them. Horses ran away at the sight and sound of a train or a threshing machine engine. The farmer's chickens have to get over being alarmed at the incredible racket of the tractor starting up suddenly in the shed adjoining the chicken house. These sights and noises are a part of our world, and airplanes are now and will be to a greater degree, likewise a part of it. These disturbances should not be treated as torts, in the case of the airplane, any more than they are so treated in the case of the railroad or public highway.

*Third.* Assuming that what the Government did was a legal wrong, I do not think that it was a taking of the plaintiffs' property. If not, the Constitution and the statute defining our jurisdiction give the plaintiffs no right to recover. The nature of the court's judgment, an award of one-half the value of the property, would indicate that the compensation is for damage done to the property, rather than for taking it. The plaintiffs still have the property, and will have it after the judgment. They will also have, of course, the amount of the judgment. The court's method of resolution of this seeming contradiction is to say that the Government has taken, not the property or one-half or any part of it but an easement in or through it. Then, the reasoning goes, the damage to the property may be appended to the interest taken, and thus included in the award made for the taking. I recognize that if the Government takes a part of a man's land, and the effect of the taking is to damage the part not taken, as, for example, by depriving it of access to a road, the incidental damage may be recovered in the suit for the taking.

The court's conclusion that an easement of flight was taken is, I think, erroneous. As I have said, I think the Government had the privilege, at least during the war, of making the flights which it has made. If so, it needed no granted easement and cannot be regarded as having taken one by doing what it had the right to do. And if it did not have the right to make the flights, I have difficulty in determining the nature of the easement which it took and should pay for. If the flights were, as the court's opinion must assume, trespasses, they would, if the defendant were an ordinary litigant, be the subject of a damage suit for past damages, and an injunction against repetition. But the fact that an ordinary person had committed trespasses on the plaintiffs' land in the past would not give the plaintiffs a right to sue the trespasser as if he had taken the land, or an easement in it, and make him pay the permanent value of the land or the easement. There is no such doctrine of the

conversion of land to one's own use by taking liberties with it, as there is in regard to personal property. Hence the plaintiffs could get no such remedy against a private defendant as they are being given here. It seems then as if the court is, by way of compensation to the plaintiffs for the fact that the Government is not suable in tort, giving them a remedy against the Government by way of compensation for property taken, which in its nature, and especially in the amount of the recovery, differs completely from any remedy the plaintiffs might have against a private litigant.

There might be justification for this stretching of legal doctrine if there was any showing of an intention on the part of the Government to make permanent use of the plaintiffs' land. But, as I have said, the Government's lease on the airport ends six months after the end of the war. Hence it is having a permanent easement forced upon it which it has no use for and should not be obliged to pay for. In the case of Portsmouth Harbor Land & Hotel Co. v. United States, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287, the court held that if the Government's installation of a coastal defense battery was with the intent of maintaining it there in time of peace, and firing projectiles across the plaintiff's land whenever it chose to do so, that would constitute a taking for which compensation should be made, but if it was merely placed as a defensive measure in time of war, it would not constitute a taking. This decision supports the idea which I have expressed above that the Government is privileged to carry on activities in wartime which may be harmful to landowners, which activities would not be privileged in time of peace. But I suppose it also shows the court's reluctance to saddle upon the Government the burden of paying the permanent value of land or interests in land for which it has no desire or use, it merely needing the use for the temporary period of the emergency. I think, therefore, that if the court concludes that the Government's repeated trespasses amount to the taking of an easement, it should award compensation for that easement, and for the incidental damage to the land, only down to the time of judgment, and should retain the case for the award of further compensation when the Government's use of the airport, and its easement, terminate at the end of the war. In this way the court could avoid compensating the plaintiffs in an amount several times as great as any loss which they will, in all probability, suffer.

JONES, Judge, took no part in the decision of this case.