# CITY OF CAPE GIRARDEAU v. HERMINIA HUNZE et al., Appellants.

Division One, May 24, 1926.

1. **JURORS: Condemnation: City as Party: Inhabitants of Sewer District.** Since the enactment of Sections 6637 and 7048, Revised Statutes 1919, tax-paying inhabitants of a sewer district, in a proceeding by the city to condemn an easement in a strip of farm land for the purpose of constructing and maintaining a sewer pipe, and to acquire an outlet for the sewer district by the use of a natural watercourse flowing through a part of the farm, are not incompetent jurors on the trial in the circuit court of exceptions to the report of the commissioners, on the theory that the lands of such inhabitants in the sewer district will be charged with benefit assessments to pay the damages. The mere fact that they reside or own property in the city or sewer district does not disqualify them.

2. **WITNESS: Condemnation: Commissioner.** A commissioner who under the order of the court examined the property to be taken or damaged for a sewer is not incompetent to testify what the damage will be at a trial in the circuit court of exceptions to the report of the commissioners, if he makes no reference to their report or to the award at which they arrived, but simply states, from his knowledge of the premises, what in his opinion the damage will be; and even if he could be held to be technically incompetent, his testimony is harmless where the verdict of the jury was for an amount far in excess of his estimate.

3. **EVIDENCE: Condemnation: Restricted Use: Replacing Land Disturbed.** In a proceeding to condemn the surface of farm land as a right-of-way for a sewer pipe to be laid underground by a designated date and thereafter to disturb the surface only as the maintenance and repair of the sewer make necessary, it is not improper to permit a witness to testify that the specifications and contract require the contractor to replace the land through which the pipe is to be laid, in the same condition in which he finds it, and, to protect such right, the contractor is required to put up a bond with the city out of which the city may restore the land within a year if the contractor does not do so. Such testimony is not inadmissible on the theory that the owner of the land is not bound by such requirements in the contract, but is entitled to be paid his damages in money, since the appropriation is limited and restricted and the city is en-

titled to any fact tending to show a reduction or diminution of the damage.

4. ———: ———: **Previous Sanitary Conditions.** Proof of the unsanitary conditions and the existence of slaughter houses along the creek on defendants' land, which is to be used as the outlet of the sanitary sewer, above the emptying point, within a reasonable time prior to the date the commissioners made their report, is competent; and particularly so, where defendants show that on the day preceding the trial a similar unsanitary condition existed. Such evidence is competent for the purpose of enabling the jury to determine what additional contamination will result from the city's use of the stream as a sewer outlet.

5. ———: ———: **Market Value: Price of Adjoining Land.** What a witness has agreed to pay for a tract of land adjoining that in which the sewer main is to be laid, in a pending negotiation which has not been consummated by a contract of purchase, is not competent evidence to establish the market value of the land in which the sewer is to be laid; and even if such evidence were competent, any error in its rejection is cured by the subsequent testimony of other witnesses showing what was the price agreed to be paid for the adjoining tract.

6. **INSTRUCTIONS: Considered as a Whole.** In determining whether the jury were misdirected on the measure of damages, all the instructions, those given for appellants and those given for respondents, are to be considered together as one entire charge to the jury, provided they are not misleading, confusing or contradictory.

7. ———: **Condemnation: Measure of Damages: Temporary Use: Rental Value.** In a proceeding to condemn an easement in a ten-foot strip of land in which is to be laid a sewer pipe, with appurtenant manholes, to be completed by a designated date, and thereafter to be maintained and repaired as necessity requires, an instruction for the city telling the jury to award to the owners the reasonable rental value of the strip until said designated date, and such other damages as will result to the owner's remaining land on account of said use for such period, and such further damage as will thereafter accrue to the owner from the construction, maintenance and repair of the sewer pipe, does not violate the rule that the true measure of damages is the difference between the market value of the whole tract of which the ten-foot strip is a part before, and its market value after, the appropriation, and is not erroneous.

8. ———: ———: ———: **Outlet to Creek: Riparian Owner.** The natural outlet of a sanitary and storm-water sewer is a branch within the corporate limits of the city, and its juncture with

City of Cape Girardeau v. Hunze.

a creek is likewise within the corporate limits, some distance above defendants' farm, through which the creek flows on its way to the river. Above the point of juncture, the creek is a natural or public watercourse eleven miles in length, flowing through a section of the city, and affords a natural drainage for twenty square miles. *Held*, first, that the owners of the farm are not the absolute owners of said natural watercourse, but merely riparian owners, and their rights in and uses of the waters of the creek are subject to the principles of riparian ownership, and as such they must endure without remedy such impurities and pollution as find their way into the stream from the natural wash and drainage of the city situated on its banks and of the lands situated within its upper watershed, and the city, as to the section thereof through which it flows, is likewise in a large sense a riparian owner; and, hence, *second*, the court did not err in instructing the jury that the city has "the same right to use the creek for its purposes, including the right to use it as a sewer outlet, as have the owners of said farm to use said stream and the waters thereof for their purposes, subject to the restriction to so exercise the right as not to create a nuisance, and to respond in damages in the event the use of the same by the city so pollutes the waters of the stream as to deprive the owners of the farm of the uses of the water they would enjoy were it not for the use of said stream by the city as an outlet for said sewer district," and that the owners of the farm were not entitled to recover damages for the mere use by the city of said stream as an outlet for said sanitary and storm-water sewer, or for the pollution of the waters of the creek caused by the natural wash and drainage into the stream above the point of the sewer's outlet, but only to the increased damage to the whole farm caused by the additional pollution of the waters arising from the emptying into the stream of the sewage from the city through the outlet pipe.

9. ———: ———: ———: ———: Mere Use: Increased Pollution. An instruction telling the jury that the owners of a farm cannot recover damages from the mere fact that the creek flowing through their farm "is to be used as a sewer outlet for a sewer district of the city" and that "you cannot find that the owners of the farm are damaged on that account alone, unless you find and believe from the evidence that the waters of said stream will be rendered more unfit for use than they are at the present time," is not erroneous.

10. ———: ———: ———: ———: Unfit for Use: Oils, Odors and Sediment. Such elements of damage as deposits, on the land through which flows the creek into which a sanitary sewer is to have an outlet of sewage, sediments, oils, greases, which will cause odors, leave stains and disclorations, are fairly comprehended by an instruction

City of Cape Girardeau v. Hunze.

which requires the jury to find that the emptying of the sewage into the stream "will render the waters of the stream more unfit for use than they are at the present time."

11. ———: ———: ———: ———: Burden of Proof: Peculiar Benefits: Excess. In the trial of exceptions by the owners of a farm to the report of commissioners appointed to assess the damages which will accrue to them from the use by a city of a creek flowing through their land as an outlet to a sanitary and storm-water sewer, an instruction telling the jury that "the burden of proof is on the exceptors to prove that the tract of land owned by them will be damaged in excess of the special benefits that may accrue to it by reason of the construction and maintenance of the sewer system," if subject to criticism on the theory that exceptors are not required to prove that the damages exceed the benefits, is cured by an instruction given at their request telling the jury that "before you can deduct anything from exceptors' damages for special or peculiar benefits, you must first find that the remainder of exceptors' property not taken will receive direct and peculiar benefits from the construction and maintenance of said sewer, and by peculiar and special benefits are meant such benefits as are not common or general to other lands in the same community, and you are further instructed that the burden of proof is upon the city to show that special or peculiar benefits will accrue to exceptors' property." The two instructions are not contradictory.

12. COSTS: Condemnation: Discretion. Under the statute (Sec. 8363, R. S. 1919), the taxing of costs accruing after the filing of the commissioners' report in a condemnation proceeding rests in the discretion of the trial court. Where the commissioners assessed the damages that will accrue to the owners of a farm from (a) the laying by the city of a twenty-one-inch sewer pipe through their lands and (b) the use of a creek flowing through the farm as an outlet for a sanitary and storm-water sewer, at fifteen hundred dollars, and they filed exceptions to the report, and a jury by their verdict found their damages to be the same amount, the trial court did not abuse its discretion in assessing the costs incurred at the trial of said exceptions against the exceptors.

Corpus Juris-Cyc. References: Appeal and Error, 4 C. J., Section 2941, p. 960, n. 94. Eminent Domain, 20 C. J., Section 148, p. 687, n. 93 New; Section 192, p. 740, n. 89, 90, 91; Section 227, p. 766, n. 62; p. 767, n. 63; Section 439, p. 1057, n. 98 New, 10 New; Section 487, p. 1115, n. 92; Section 489, p. 1120, n. 23; Section 509, p. 1138, n. 72 New. Evidence, 22 C. J., Section 28, p. 86, n. 75; Section 150, p. 187, n. 8. Juries, 35 C. J., Section 329, p. 315, n. 66; p. 317, n. 79. Statutes, 36 Cyc., p. 1179, n. 15. Trial, 38 Cyc., p. 1605, n. 69; p. 1666, n. 83; p. 1778, n. 73; p. 1779, n. 75, 76; p. 1781, n. 77; p. 1782, n. 81; p. 1785, n. 90. Waters, 40 Cyc., p. 595, n. 36.

Appeal from Cape Girardeau Court of Common Pleas.
—*Hon. John A. Snider*, Judge.

AFFIRMED.

*Spradling & Dalton* for appellants.

(1)   Instructions numbered 6, 7, 3 and 2 given at the request of respondent are erroneous, because they limit recovery to the actual physical damages, and therefore do not correctly state the measure of damages.   (a) The measure of damages where a part of a farm, or certain rights therein, are condemned and taken, is the difference between the fair market value of the whole property before and its fair market value after the appropriation in view of the uses to which the condemned portion or rights are to be thereafter applied.   Railroad v. Real Estate Co., 204 Mo. 565; Railroad v. Kemper, 256 Mo. 279; Janes v. Levee District, 183 S. W. 700; McElroy v. Air Line, 172 Mo. 546; Doyle v. Railway Co., 113 Mo. 280.   (b)   Even if the actual physical damage to appellants' farm on account of the use of Cape La Croix Creek as a sewer route would be negligible and even if there had been no substantial evidence as to the extent of the damages, yet if the taking of the right to use said creek as sewer route and the laying of said twenty-one inch sewer pipe decreased the market value of the appellants' farm they were entitled to substantial damages. Prairie Pipe Line Co. v. Shipp, 267 S. W. 649; St. Louis v. Hill, 116 Mo. 527; Tel. Co. v. Railroad, 202 Mo. 656. (c)   The opinions of appellants' witnesses as to the effect on the market value of the remainder of appellants' farm on account of the taking of the particular rights therein was competent evidence on a proper item of damage and should not have been excluded from the consideration of the jury as it was by respondent's Instructions 6, 7, 3 and 2. Prairie Pipe Line Co. v. Shipp, 267 S. W. 649; Railroad v. Brick Co., 198 Mo. 698; K. C. Railway v. Norcross, 137 Mo. 415; Rourke v. Railroad, 221 Mo. 46; Knapheide v. Jackson Co., 215 Mo. 516. (d)   The collection and discharge of storm water and sewage by a sewer system and the collection of sewage and storm

water that would not have otherwise drained toward Cape La Croix Creek added a burden on appellants' land which the jury was entitled to consider and it should not have been excluded from their consideration. Mining Co. v. Joplin, 124 Mo. 129; Lynch v. Railroad, 180 Mo. App. 169; Thoele v. Mill Co., 165 Mo. App. 707. (2) Instruction 4 given by the court at the request of respondent is erroneous because it put the burden of proof upon the appellants to show their damages exceeded the special benefit, if any. The burden of proof as to damages was on appellants and the burden of proof of special and peculiar benefits was on the respondent and the appellants were not required to prove that the damages exceeded the benefits. Bennett v. Woody, 137 Mo. 377; St. Louis Ry. Co. v. Co., 160 Mo. 396; 20 C. J. 282, sec. 386, p. 826, sec. 261. (3) The court erred in not striking out the statement of Hawley that he was a commissioner appointed to assess the damages in this case. Mr. Hawley "was a competent witness in this case, but the fact that he was one of the commissioners who had assessed the damages sustained by defendant should not have been permitted, either directly or indirectly, to go to the jury." School Dist. v. Land & Imp. Co., 249 S. W. 53. (4) The court erred in giving instruction numbered 7, because it did not correctly declare the land and there was no evidence upon which to base this instruction. (a) There was no evidence that respondent was the owner of a dominant estate, and it was therefore not entitled to any rights in Cape La Croix Creek. Walther v. Cape Girardeau, 166 Mo. App. 467. (b) Even if the respondent was the owner of the dominant estate it could not pollute the watercourse or collect water from other water sheds or from this water shed and discharge it in a body on the servient estate to its damage without compensation. Paddock v. Somes, 102 Mo. 226; Haynor v. Water Co., 129 Mo. App. 691; Lynch v. Railroad, 180 Mo. App. 169; Grant v. Railroad, 149 Mo. App. 306. (5) The court erred in permitting C. E. Smith to tell the jury what the city's contract provided with reference to leaving the

land in the condition in which it was found, for the reason that respondent was not entitled to pay the damages in anything but money, and was not bound by this statement. 20 C. J. 768, sec. 227; Railroad v. Brick Co., 198 Mo. 698; Railroad v. McGrew, 104 Mo. 282. (6) The court erred in permitting the witnesses to detail the conditions of the slaughter houses along Cape La Croix Creek in September, 1922, for the reason that said conditions did not exist at the time the commissioners' report was filed nor would the contamination of this stream by other persons justify the city in polluting the stream without paying compensation. Damages should be fixed at date of commissioners' report. Railroad v. Imp. Co., 256 Mo. 386; Railroad v. Fowler, 113 Mo. 458; Railroad v. Stewart, 201 Mo. 491. (7) The court erred in taxing the costs of the trial against the appellants, and in the absence of appellants or their attorneys, and without giving them any opportunity to be heard, and this was an abuse of its discretion. Sec. 1796, R. S. 1919; Railroad v. Elliott, 117 Mo. 549. (8) The court erred in refusing to excuse the jurors who owned land and resided in Sewer District No. 5, because they had a direct and special pecuniary interest in the outcome of this suit, and their property was subject to special assessment to pay any judgment which appellants might recover. Edmonds v. Woodmen of America, 125 Mo. App. 214; State v. Fullerton, 90 Mo. App. 411.

*James A. Finch, James A. Barks* and *Bush H. Limbaugh* for respondent.

(1) The instructions given by the court, at the request of the respondent, as to what should be considered by the jury in determining compensation, followed the petition and the evidence offered at the trial and directed the jury in terms most favorable to appellants. (a) The instructions were given as steps in a series covering the entire case, and must be considered as a whole, and if all of the instructions given, when taken to-

gether, correctly declare the law of the case, the fact that any one of the instructions, taken alone, may be incomplete or erroneous does not constitute error. Prentiss v. Ill. Life Ins. Co., 225 S. W. 702; Hulse v. Ry. Co., 214 S. W. 154; Cassin v. Lusk, 277 Mo. 669; Chicago-Great Western Ry. Co. v. Kemper, 256 Mo. 279. (b) Respondent acquired the right to a temporary use of a strip of appellants' land, and a limited right to use said strip of land thereafter, which uses were defined with particularity in the petition and the evidence, and Instruction 2 correctly directed the jury as to what they should consider in determining just compensation for the taking of such rights. 20 C. J. 740; St. Louis v. Brown, 155 Mo. 545; Chicago S. F. & C. Ry. Co. v. Mc-Grew, 104 Mo. 282. (c) The rights which respondent acquired in Cape La Croix Creek were rights to use an agency already impressed with a public use, and appellants were not entitled to the same measure of damages for such appropriation, although under all the instructions, appellants got the benefit of such measure of damages. Both on reason and authority, the rule applied for measuring damages for the taking of property absolutely under the control of the owner cannot be applied when the property sought to be used is not the absolute property of the individual, but is impressed with a public use. St. Louis v. Clegg, 233 S. W. 1; McKee v. St. Louis, 17 Mo. 191; City of Valparaiso v. Hagen, 153 Ind. 337. (d) Cape La Croix Creek was impressed with a public use, because the proprietor of land through which a stream flows cannot insist that the water shall come to him in its natural, pure state, but must submit, and that too without compensation, to the reasonable use of such stream by the upper proprietors, and he must submit to the natural wash and drainage coming from towns and cities. Joplin Mining Co. v. Joplin, 124 Mo. 135; City of Valparaiso v. Hagen, 153 Ind. 337. (2) There is nothing in the record to show whether attorneys for litigants were present or absent when the judgment of the trial court was en-

tered, but that is wholly immaterial, since the matter of taxing costs, after the filing of the report of the commissioners, rests entirely in the discretion of the court. Secs. 1796, 8363, R. S. 1919. (3) The testimony of witness C. E. Smith as to the character of work to be done was proper, in order to enable the jury to determine the character of the use of appellants' land, since the city was seeking only to condemn the surface of the right of way up to January 1, 1924. 20 C. J. 766; Railroad v. Knapp-Stout Co., 160 Mo. 396; Railroad v. Clark, 121 Mo. 169; Railroad v. Union Stock Yards, 120 Mo. 541. (4) By express provision of the statute, all residents and taxpayers of the city were competent jurors, unless otherwise disqualified. Sec. 6637, R. S. 1919. (5) It was proper for the court to permit witnesses to testify as to conditions at slaughter houses on date other than commissioners' report, since other evidence was offered to show that similar conditions had prevailed at the slaughter houses long before and shortly following the commissioners' report. 22 C. J. 86, 87; Nelson v. Jones, 245 Mo. 579; Kansas City So. Ry. Co. v. Second Street Imp. Co., 166 S. W. 296.

SEDDON, C.—This is a suit brought by the city of Cape Girardeau under the provisions of Sections 8354 to 8371, inclusive, Revised Statutes 1919, to condemn an easement in a strip of land, approximately 2469 feet in length and 10.5 feet in width, across the north end of appellants' farm, for the purpose of constructing and maintaining thereon a twenty-one inch sewer main or pipe, manholes and appurtenances, and also to acquire, as an outlet for Sewer District No. 5 of said city, the right to the use of a certain natural watercourse, known as Cape La Croix Creek, which flows through the north part of appellants' farm. Commissioners were appointed by the court to determine the damages and, on January 18, 1923, said commissioners filed their report fixing appellants' damages at $1500. Appellants in due time filed their exceptions to said report, whereupon

a trial by common-law jury was had on March 16, 1923, resulting in a verdict and judgment fixing appellants' damages at $1500, from which they appeal.

During the interim between the filing of the commissioners' report and the trial of appellants' exceptions thereto, the city paid into court the sum of $1500, awarded to appellants as damages by the commissioners, and such sum was paid to appellants on February 17, 1923, prior to the trial by jury of appellants' exceptions to the commissioners' report. The judgment entered upon the jury's verdict contains this finding:

"The court further finds that it is left to the discretion of the court to assess the costs of the trial of said exceptions to either the plaintiff or the exceptors, and since the award of the jury of damages to the exceptors in this case is not in excess of the award to said exceptors made by the commissioners herein, but is in the same amount, the court believes that it will be in the interest of justice and right in this matter that said cost be taxed against said exceptors, and it is, therefore ordered and adjudged that all of the costs of the trial of said exceptions be and the same are hereby taxed against said exceptors, and that execution may issue therefor."

The rights taken and acquired by the city in this proceeding, as disclosed by the pleadings and judgment, are of two kinds. The first kind are the rights incident to the construction and maintenance of a twenty-one inch sewer main or pipe, manholes and appurtenances, on the aforementioned strip of land owned by appellants, and the second kind are the rights to use, as a sewer outlet, the natural watercourse, known as Cape La Croix Creek, across part of appellants' land. In the first group or kind of rights, the city acquired the absolute use of the strip of land from January 18, 1923, to January 1, 1924, for the purpose of constructing the twenty-one inch sewer pipe, manholes and appurtenances, and a permanent easement through said strip of land for said pipe, manholes and appurtenances, and the right to enter on said strip of land after January 1, 1924, at such times as will

be reasonably necessary for the maintenance and repair of said pipe, manholes and appurtenances. In the second group of rights, the city acquired the use of Cape La Croix Creek as an outlet to the Mississippi River from said Sewer District No. 5 at such times when said twenty-one inch sewer main is inadequate to carry off all the storm water and sanitary sewage from said sewer system.

Appellants' evidence tends to show that they are the owners of a 320-acre farm, lying in one body and situate upon a hard surface road or highway about one-fourth mile south of the southern limits of the city of Cape Girardeau. Cape La Croix Creek flows through the north part of the farm for a half to three-quarters of a mile. The farm is improved with an eleven-room residence with heat, water and bath; four chicken houses; a feed house; a workshop; a double garage; corn crib and shed; hay shed; granary; machine shed; combination stock and hay barn; mill shed; tenant house; combination machine and hay shed; engine shed; hog shed; smoke house, power plant and other out-buildings; and a large well. Appellants' witnesses fixed the reasonable market value of the said improvements at $26,665. The various buildings are located close to and on the south bank of Cape La Croix Creek. The farm is used for farming and dairy purposes and is suitable for platting into city lots. The well is located about ninety feet, and the barns one hundred to one hundred fifty feet, from the creek. The residence house is about two hundred feet south of the creek. About thirty-five or forty acres of the farm lie north of Cape La Croix Creek, the remainder of the farm lying southwest of the creek. All of the farm is in cultivation, except sixty to seventy-five acres, which is pasture and woodland. The water in Cape La Croix Creek is used by appellants for stock purposes. It is a running stream of water, fed by springs, and is never dry, furnishing water for the stock "all the year around." Appellants, however, do not use the water for human drinking or for house purposes.

Cape Girardeau is a city of the third class, located upon the Mississippi River, and Sewer District No. 5 embraces a territory in the western part of the city about one and one-half miles in length, of varying width, and containing an area of approximately 408 acres, and is inhabited by about 4,000 people, and approximately 800 families or homes. The natural drainage of the lands within the sewer district is southwardly through a small watercourse, known as Painter Spring Branch, and thence into Cape La Croix Creek, which in turn empties into the Mississippi River. Cape La Croix Creek drains a watershed about eight miles long and two and one-half miles wide, extending northwestwardly from Cape Girardeau. On account of the meandering of the creek, the stream itself is about eleven miles in length from its source to its point of junction with Painter Spring Branch. The point of junction of Painter Spring Branch and Cape La Croix Creek is within the limits of Cape Girardeau. From this point, Cape La Croix Creek meanders southeastwardly, beyond the city limits, a distance of about two miles, to the Mississippi River. It drains an area of approximately twenty square miles, or 12,800 acres, about thirty times the area of Sewer District No. 5. It is an active stream with sufficient fall to create a rapid velocity, or current, in times of flood or heavy rainfall. It is a tortuous stream and, as it passes across appellant's farm, its banks are timbered and grown up in brush. In some places it is shallow and in other places deep, so that, in dry times, there are pools of water with riffles between.

The system devised for Sewer District No. 5 is known as a combined sanitary and storm-water system. The general plan calls for a net work, or lattice, of lateral sewers connected with the houses in the district, gathering the sanitary sewage from the houses, and the storm, or surface, water from the streets, sidewalks, and buildings, and carrying both into larger mains. This net work of mains or pipes is divided into two sections, one serving the north and middle parts of the district,

and the other serving the southeast part of the district. The first section is so laid out that the contents of the lateral mains converge and flow into a large concrete main or pipe, having a diameter of eight and one-half feet, which in turn discharges into a concrete basin, called an interceptor. The second section converges and flows into another concrete main or pipe having a diameter of fifty-one inches, which in turn empties into a second concrete basin, or interceptor. These two concrete basins, or interceptors, contain grit-chambers, so-called, the purpose of which is to collect the inorganic matter brought down by the sewers, such as sand, gravel, rock and other hard matter. This collected inorganic matter is removed periodically. The concrete basins or interceptors are approximately thirty feet long, ten feet wide, and five or six feet deep. At the lower end of each basin is a slot or opening two feet wide, which converges into a twenty-one inch pipe connecting the two interceptors, and thence into a twenty-one inch main or pipe, which runs underground for a distance of two miles to the Mississippi River. The twenty-one inch main is designed with a carrying capacity sufficient to take care of all the sanitary sewage and surface water of the district except in times of rainfall when the "run off" exceeds one-half inch, the "run off" being equivalent to a half-inch rainfall when the ground is so thoroughly saturated with moisture that it will no longer absorb the rainfall. When the storm water and sanitary sewage flowing into the interceptors exceeds the carrying capacity of the twenty-one inch main, the excess overflows into what is called an outlet ditch, seven feet wide at the bottom, twenty-five feet wide at the top, and eight to ten feet deep. A short distance from where the outlet ditch leaves the interceptors, it runs into Painter Spring Branch, and thence into Cape La Croix Creek. This outlet ditch picks up the water coming out of both interceptors after the twenty-one inch main is filled to its capacity, and carries the overflow, consisting of storm-water and sanitary sewage, through Paint-

er Spring Branch into Cape La Croix Creek, and thence into the Mississippi River some two miles distant. The twenty-one inch main has a carrying capacity of five cubic feet per second, and is so designed that the sanitary sewage will not flow into the outlet ditch except at times when the carrying capacity of the twenty-one inch main is inadequate to carry the flow from the system. The interceptors are not designed for use as settling basins or septic tanks, but are chambers designed to collect heavy substances so as to prevent the obstruction of the twenty-one inch main. In designing the system, future growth and development of the district was taken into consideration by the engineers. It was estimated that the district will have an ultimate population of 12,240 people and, by using an established engineering formula, it was estimated that the system will ultimately produce, when fully populated, a minimum flow of sanitary sewage of about one and one-half cubic feet per second. From such hypothesis, it was determined to use a twenty-one inch main, which is of sufficient capacity to carry off nearly four times the amount of sanitary sewage expected to be produced in the district when it is fully populated.

The method of sewage disposal used in this system is known as sewage disposal by dilution. By this method, sanitary sewage is discharged into a running stream or body of water of sufficient capacity that the proportion of river or storm water to sewage is considered large enough as not to constitute a nuisance or menace to public health. Respondent offered evidence that the dilution method of disposal is used almost exclusively by Chicago, St. Louis, Kansas City, and other large centers of population, and that about forty million people in the United States are using sewer systems, of which about eighty-five per cent dispose of sewage by the dilution method. Respondent's evidence also tends to show that the ratio of thirty parts of water to one part of domestic, or sanitary, sewage is generally accepted by sanitary engineers as sufficient to prevent a nuisance; that

ordinary sanitary sewage contains 99.8 per cent water and .2 per cent organic matter; that dilution with water tends to destroy sewage; that the organic matter will become attenuated, or broken up, by the process of dilution; that when the flow from the sewer system into the interceptors overflows the twenty-one inch pipe and passes from the outlet ditch and through Painter Spring Branch into Cape La Croix Creek, the ratio of dilution will be 800 parts of water to one part of sanitary sewage; that after the overflow reaches Cape La Croix Creek, but before it is sufficient to overflow appellants' land, the ratio of dilution is 1600 parts of water to one part of sanitary sewage, or more than fifty times the dilution that will prevent a nuisance; and that, in times of flood, when Cape La Croix Creek will overflow appellants' land, the ratio of dilution will be 3,000 to 4,000 parts of water to one part of sanitary sewage; that the twenty-one inch sewer main was designed to, and will, conduct the sanitary sewage each day of the year underground to the Mississippi River, except the overflow in times of rain; that under no circumstances will any solid sewage matter be deposited upon appellants' land; that there will be nothing deposited thereon to kill the grass or crops or to produce odors or discoloration; that the sewer system is so designed that, in case of a fast falling rain, sufficient to tax the carrying capacity of the twenty-one inch main, the maximum discharge or overflow through the outlet ditch will reach Cape La Croix Creek in twenty minutes, whereas it will take some two or three hours for the water falling from the same rain in the Cape La Croix Creek watershed to reach floodcrest at the junction of the creek with Painter Spring Branch, which will have the effect of washing and scouring out all objectionable sewage matter which might be carried into the creek from the outlet ditch; and that, as the rain ceases, Cape La Croix Creek will continue running in flood a considerable time after the sanitary sewage ceases to flow through the outlet ditch and recedes into the twenty-one inch main.

Respondent's proof also tends to show that several slaughter houses are located on the banks of Cape La Croix Creek above appellants' farm; that the sanitary conditions of these slaughter houses are bad; that entrails of animals are permitted to accumulate and decay on the ground, and stagnant pools of blood are permitted to remain, and that such refuse and blood drains into the creek; that throughout the sewer district there are more than one hundred open cesspools, contiguous to, and which seep and drain into, Painter Spring Branch and Cape La Croix Creek, and the waters of those streams are polluted by the waste and drainage from these cesspools and slaughter houses; that, under conditions existing before the completion and operation of the sewer system, refuse matter is constantly flowing into Cape La Croix Creek and polluting its waters, but, when the sewer system goes into operation, the existing conditions will be greatly improved and sanitary sewage will pass into the stream only in time of heavy rains; that analyses of samples of water taken from different points along the creek, including appellants' farm, before the completion and operation of the sewer system, showed B. Coli and organic matter, rendering it unfit for human use, although it could be safely used as stock water; and that the use of the watercourse for a sewer outlet at times of rainfall will not make conditions worse, but should remedy and improve existing conditions.

Appellants' evidence tends to show that all of the storm water and sewage brought down by the system, and not carried away by the twenty-one inch pipe, will flow down the outlet ditch into Cape La Croix Creek; that, when the sewer system is running at full capacity, only about six gallons out of a thousand will pass out through the twenty-one inch pipe and the balance of the storm water and sewage will pass out into Cape La Croix Creek; that Cape La Croix Creek, as it flows through appellants' farm, is very crooked, and its banks are grown up with brush, and in some places the stream is shallow and at other places deep; that in dry

times it stands in pools; that the sewage will settle and deposit along the banks of the stream and will be caught by the trees, brush and fences along the banks and in the existing pools; that these deposits will be decaying organic matter and will produce offensive odors.; that oil and grease from kitchens will not mix with water and there will be no dilution of that matter; that oils and fats will deposit and accumulate on appellants' lands and become media for germ and bacterial growth; that typhoid bacilli will live on such matter for a period of eight or ten months and retain the power to produce typhoid fever; that the only pollution of the creek water, prior to the operation of the sewer system, is what is washed from the ground in the Cape La Croix Creek watershed, and that the amount thereof is small; that after the sewer system is completed and in operation it will tend to collect sewage in much larger amounts, and that, therefore, the pollution of the creek will be greatly increased over existing conditions. Appellants' evidence further tends to show that, after the twenty-one inch sewer pipe has been constructed along the ten and one-half foot strip of land, the ground will likely settle and cave in; that the plan calls for laying the twenty-one inch pipe eight feet below the surface of the ground and for constructing manholes every 400 feet across appellants' land, or a total of seven manholes; that these manholes are made of brick and extend from six inches to one foot above the surface of the ground and are twenty-four inches in diameter at the top; that the manholes will be obstructions and will interfere with plowing and harrowing of the ground, and the use of farm machinery thereon; that the non-arable soil from ten feet under ground will be placed on the surface; that the land is then in timothy and being used for pasture and that the surface will be torn up and disturbed, requiring a long time before it can be used or cultivated.

Appellants' witnesses fixed the reasonable market value of appellants' farm and improvements at $200 to $225 per acre, or an aggregate value of $64,000 to $72,000,

and estimated appellants' damage, or decrease in the market value of the farm, by reason of the several rights or uses sought to be taken and condemned, at from twenty-five to thirty per cent of its then market value.

Respondent's evidence shows that the strip of land taken for the twenty-one inch sewer main contains six-tenths of an acre; that the strip crosses the north end of the farm and is subject to overflow; that, after the operation of the sewer, it will be necessary for two men to go into the manholes for the purpose of cleaning the sewer perhaps once each year. It was also shown that the contract and specifications for the construction of the sewer require the contractor to replace the soil on the strip of land in the same condition in which it is found. Respondent's witnesses fixed the market value of appellants' farm at from $125 to $150 per acre as a whole, and the value of the land taken for the twenty-one inch sewer at from $150 to $175 per acre. The total damage to appellants' farm on account of all the rights or uses taken and condemned was fixed by respondent's witnesses at from $50 to $1,000.

Numerous errors are assigned by appellants, which will be considered and ruled by us in their order.

I. At the beginning of the trial, counsel for appellants inquired of the jurors: "Do any of you gentlemen own property in Sewer District Number Five?" A number (not shown by the record) of the jurors answered in the affirmative. Whereupon, counsel for **Jurors.** appellants objected to jurors who are residents of the district for the reason that they are interested, and the court thereupon replied: "Objection overruled. The record may show the action of the court in refusing to excuse from the jury residents and taxpayers of the district." Exceptions were duly saved and appellants assign error in the trial court's refusal to excuse such jurors from the panel. It is argued by appellants that those jurors who own property in the sewer district have a special and peculiar financial interest in the outcome

of the case in that the cost of acquiring rights of way for the sewer system is paid by special tax levied and assessed upon the real property within the district.

At common law, inhabitants and tax-paying citizens of a municipality were held to be incompetent to sit as jurors in a cause wherein the municipality was a party, because of their interest, though remote, by being compelled to contribute their mite to the payment of any judgment obtained against the municipality. A number of early decisions of this court recognized and adhered to the common-law rule. [Eberle v. St. Louis Public Schools, 11 Mo. 247; Fine v. St. Louis Public Schools, 30 Mo. 166; Rose v. City of St. Charles, 49 Mo. 509; Fulweiler v. St. Louis, 61 Mo. 479.] Since those early decisions, the Legislature has enacted a statute (Sec. 6637, R. S. 1919), which provides: "In all actions brought by or against any county or city, the inhabitants of the county or city so suing or being sued may be jurors, if otherwise competent and qualified." Appellants insist that the foregoing statute is in derogation of the common law and hence must be strictly construed. The Legislature, however, in 1917 (Laws 1917, p. 324) repealed our former statute relating to the common law and enacted a new section in lieu thereof which provides: ". . . but no act of the General Assembly or law of this State shall be held to be invalid, or limited in its scope or effect by the courts of this State, for the reason that the same may be in derogation of, or in conflict with, such common law, or with such statutes or acts of Parliament; but all such acts of the General Assembly, or laws, shall be liberally construed, so as to effectuate the true intent and meaning thereof." [Sec. 7084, R. S. 1919.]

In Priddy v. Mackenzie, 205 Mo. l. c. 195, we said: "This court has, however, repeatedly held in actions against counties and cities that tax-paying inhabitants thereof are not competent jurors on account of interest in the cause—(Citing cases). And (as) such was the law of this State in so far as jurors were concerned until it was changed by express statute in 1855. [R. S.

1855, p. 503, sec. 9.] Since the enactment of that statute qualifying jurors in such cases, the probabilities are the courts would not go to the same length . . . as this court went in the cases which held the jurors were disqualified. But be that as it may, the cases from this State . . . show the high degree of disfavor with which the law looks upon trials conducted by interested parties.''

Our attention has not been directed by counsel to any other decision of this court construing or referring to our statute which qualifies the inhabitants of a city as jurors in actions brought by or against such city. Similar statutes of other jurisdictions have been uniformly upheld and liberally construed. [16 R. C. L. 279; State v. Paving & Construction Co., 95 W. Va. 610, 122 S. E. 173; Wichita Water Co. v. City of Wichita, 98 Kan. 256; City of Minneapolis v. Wilkin, 30 Minn. 140; Johnston v. Rankin, 70 N. C. 550; Bowker v. Wright, 54 N. J. L. 130.] The record in the instant case does not disclose that counsel for appellants pursued their inquiry further on *voir dire* examination to determine the impartiality of the jurors who were owners of property in the sewer district. While we believe that trial courts should use great caution in the selection of impartial jurors in the trial of causes, and that, upon the slightest showing of partiality or bias, a juror should be excused by the trial court, we cannot say in the instant case, in view of the existing statute, that the trial court committed reversible error in refusing to excuse as jurors property owners in the sewer district.

II. One of the commissioners appointed by the court to assess the damages in this proceeding appeared at the trial as a witness for respondent city. He was permitted, over the objections of appellants, to testify to his appointment as a commissioner. Appellants assign as prejudicial error the refusal of the trial court to strike out such testimony. The point arose in this manner:

**Witness: Commissioner.**

"Q. Do you know, or have you made a study of the plan for the sewage disposal of that sewer district? A. Somewhat. I am familiar with it.

"Q. Do you know the general outline of the plan for taking care of the sewage in that district? A. Yes.

"Q. In what connection did you make a study of those plans, Mr. Hawley? A. I made a brief study of them with a view to bidding on the work, but nothing extensive.

"Q. Have you subsequent to that time made any further investigation of them? A. I looked them over a little one time since then.

· "Q. When was that? A. In December.

"Q. What connection did you have with them at the time that led you to make a study of them? A. I was appointed on the commission to go on the Hunze land.

"(MR. SPRADLING, appellants' counsel): Object, ask that be stricken out, because not defensive and highly prejudicial.

"THE COURT: Objection overruled. To which ruling of the court the exceptors by their counsel then and there duly excepted." Later on witness testified further:

"Q. Now, Mr. Hawley, I will ask you to state whether or not in your opinion as an engineer and from your investigations that you have made of the plan for sewage disposal for District No. 5 in this city, and your investigation of the way those plans will affect the Hunze lands, whether or not those lands will be damaged as a result of this sewer construction and, if so, to what extent? A. I don't think they will be damaged at all by the flow into Cape La Croix Creek. I believe there will be some damage by reason of the thirty inch pipe crossing nearly half a mile of Mr. Hunze's land.

"Q. Tell the jury what in your opinion that damage would amount to. A. It is a little bit hard to arrive at. It does not damage the whole farm at all. It merely damages the north end of the eighty acres it runs

through, and I would say for all time to come; that is a perpetual work there that has to be maintained, and I would say six or seven hundred dollars would be a reasonable damage to that part of the farm.''

Appellants concede in their brief that Mr. Hawley ''was a competent witness, in this case, but the fact that he was one of the commissioners who had assessed the damages sustained by defendants should not have been permitted, either directly or indirectly, to go to the jury.''

In St. Louis v. Abeln, 170 Mo. l. c. 326, we said: ''It is also assigned for error that the court allowed the commissioners to be called and to testify as witnesses. We see no reason why the commissioners are not competent witnesses in such case. There is no statute disqualifying them, and no principle violated in allowing them to testify. . . . Since the able counsel for appellant suggest no reason and cite no authority in support of this assignment, we are satisfied that neither reason nor authority for it can be found.''

Appellants rely mainly upon School District v. Phoenix Land & Improvement Co., 249 S. W. 51, and Kansas City Southern Railway Co. v. Improvement Co., 256 Mo. 386, in support of their contention respecting this assignment of error. In the first mentioned case, counsel for condemnor stated to the jury, in his opening statement, that the witness McElroy had been appointed by the court as one of three commissioners, who were disinterested men, to view the property taken and make a fair report, and that their report was sworn to and filed in the case. Witness was permitted, over the objections of defendants, to state at length what he and the other commissioners did and learned while performing said service. He testified that the three commissioners agreed on the amount; that they swore to their report and filed it. Thereupon, the following occurred: ''Q. I will ask you to give your opinion as to the value of that property (taken)? A. $41,950. Q. $41,950. I think you said you and your co-commissioners agreed?'' Upon the

suggestion of the trial court the last question and answer were withdrawn, after the jury had heard the testimony. In that case, Division Two of this court, speaking through RAILEY, C., said: "We are of the opinion that Mr. McElroy was a competent witness in this case, but the fact that he was one of the commissioners who had assessed the damages sustained by defendant should not have been permitted, either directly or indirectly, to go to the jury. . . . As heretofore stated, when a jury trial was awarded defendant, the report of the commissioners, and everything they did, had become *functus officio,* and should have been kept from the jury trying this case. . . . Keeping in mind the opening statement of plaintiff's counsel heretofore quoted, a part of which was objected to at the time, we are decidedly of the opinion that the testimony of Mr. McElroy complained of was not only prejudicial to the rights of defendant, but admitted in disregard of the principles of law enunciated in the cases heretofore cited. Where damaging testimony of this character has improperly gone to the jury, the only way in which substantial justice can be administered is to grant a new trial."

In the latter cited case, one of the commissioners was called as an expert witness by the condemnor, and the report of the commissioners was repeatedly adverted and referred to for the purpose of refreshing his recollection as to the value of the land taken. In that case, GRAVES, J., speaking for this division of our court, said: "It is next insisted that there was error in the admission of the testimony of the witness Truitt. This witness was one of the commissioners. He seemed to have had no independent recollection of the value fixed by the commissioners. Counsel for the plaintiff was trying to refresh the witness's recollection by having him refer to the report. . . . It is clear that counsel for defendant was objecting to the use which was being made of this report, i. e., to refresh the recollection of an *expert* witness. It is clear that the report was so used. It is further clear that in doing so the substance of that

report was before the jury. The report was not proper-
ly used to refresh the expert witness. An expert testifies
to things within his own knowledge, or gives his expert
opinion upon a hypothecated state of facts. There is no
reason for refreshing the recollection of such a witness.
Upon the whole the examination of this witness was im-
proper, and constituted prejudicial error.''

We believe the afore cited cases are readily distin-
guishable from the case at bar. A careful reading of the
record in the instant case fails to disclose a reference
to the commissioners' report or the slightest suggestion
or intimation respecting the contents of that report or
the amount assessed by the commissioners as appellants'
damages by reason of the rights taken hereby. It is ap-
parent that the jury were not influenced by witness Haw-
ley's testimony, for they returned a verdict assessing
appellants' damages at more than twice the amount the
witness had testified appellants would sustain. If there
be error in the action of the trial court (and we think
there was none), it was harmless, and hence not reversi-
ble error. [Sec. 1513, R. S. 1919; Green v. City of St.
Louis, 106 Mo. 454.]

III. One of respondent's witnesses, the supervis-
ing engineer for the city, was permitted to testify, over
appellants' objections, that the specifications and con-
tract for the construction of the sewer require the con-
tractor to replace the land, through which the
Replacing       underground sewer main across appellants'
Surface.        farm is to be laid, in the same condition in
which he finds it, and that, to protect such right, the con-
tractor is required to put up a bond with the city, out of
which the city may restore the land within a year, if the
contractor does not do so. The admission of that tes-
timony is assigned as error on the ground that appel-
lants are not bound by the contract requirement, and on
the further ground that respondent is not entitled to
pay the damages assessed in anything but money. In
ruling this assignment it must be borne in mind that the

city is seeking to condemn the right to disturb the surface of the right-of-way only up to January 1, 1924, and thereafter the right to go upon the surface only so far as the maintenance and repair of the sewer necessitates.

In 20 Corpus Juris, page 766, the text-writer announces this general rule: "Any fact which, by reason of the conditions upon which the property is taken, or the character of the improvement or the manner in which it is made, or the nature and situation of the land taken or of the residue, tends to ameliorate, counteract, diminish, mitigate, or reduce the damages otherwise accruing to the landowner, may properly be considered in favor of the appropriator in the assessment of damages, although the benefit is not one necessarily accruing from the construction of the improvement. Thus, if the use sought to be appropriated is a restricted or limited use and one which will still reserve to the landowner some right in the property affected, such fact should be considered in assessing damages." St. Louis Railroad Co. v. Knapp-Stout & Co., 160 Mo. 396, and St. Louis Railway Co. v. Clark, 121 Mo. 169, seem to be in consonance with the rule announced. We see no reversible error in the reception of this testimony.

IV. Error is assigned in permitting respondent's witnesses to detail the sanitary conditions existing at the slaughter houses on Cape La Croix Creek prior to the date of filing the commissioners' report on January 18, 1923. Of course, it is well settled in this State "as a general rule the appropriation and taking is fixed as of the date the commissioners make their report of the damages, and the condemning party pays such sum into court for the benefit of the landowner." [Kansas City Southern Railway Co. v. Improvement Co., 256 Mo. 1. c. 407, and cases there cited.] However, respondent showed by at least one witness, who visited the slaughter houses the day before the jury trial in March, 1923, that a similar unsanitary condition then existed at that location on

<span style="font-variant: small-caps">Prior Unsanitary Conditions.</span>

Cape La Croix Creek. Besides, proof of the existence of a fact or condition at a particular time within reasonable limits, gives rise to the inference that it continues to exist, in the absence of proof to the contrary. [22 C. J. 86.]

But appellants furthermore contend that the pollution of this stream by other and third persons does not justify the city in polluting the stream without paying compensation. However that may be, we think the evidence complained of was admissible for the purpose of enabling the jury to determine what, if any, additional contamination will result by reason of the city's use of the stream as a sewer outlet, and thereby to determine the damages, if any, resulting from such additional contamination, for it seems clear to us that the city cannot be made to respond in damages (at least in this condemnation proceeding) for the contamination of the stream by the owners of the offending slaughter houses.

V. Appellants offered as a witness one Carter, who was asked what price he had *agreed* to pay for a tract of land adjoining that of appellants, evidently for the purpose of establishing the market value of appellants' land. The trial court rejected this offer of proof, and appellants assign error. Asked if he had recently acquired any real property adjoining the Hunze land, witness replied: "I have not closed the trade up, but we are still dickering." In view of the fact that witness had not contracted for the purchase of the adjoining land, we see no reversible error in the rejection of the proferred testimony. Mere negotiation for purchase of property, which may never result in a sale, does not establish an accurate basis or criterion for its market value. Besides, appellants showed, by other witnesses, the price that witness Carter had agreed to pay for the adjoining land, and thereby in effect succeeded in getting substantially the material parts of the rejected testimony before the jury. Appellants are, therefore, in no

*Market Value.*

position to complain of the error assigned. [Baker v. Contracting Co., 282 Mo. 685.]

VI. Appellants assign error in the giving on behalf of respondent of instructions numbered 2, 3, 4, 6 and 7. It therefore becomes necessary for us to state the substance of those instructions.

In respondent's Instruction 2, the jury were charged that "in fixing the just compensation to be allowed to the exceptors for the acquisition by said city of the right in the ten-foot strip of land described in the petition and referred to in the evidence in this case, you **Instructions.** shall award to the exceptors the reasonable rental value of the land acquired for the time which plaintiff city proposes to use it, namely, from the date of the commissioners' report until January 1, 1924, and the damages which you may find from the evidence will result to exceptors' remaining land on account of said use for such period, and such further damage, if any, as you may believe and find from the evidence will result to the exceptors on account of the use by the plaintiff of said ten-foot strip for the construction, maintenance and repair of said twenty-one inch sewer pipe."

By respondent's Instruction 3, the jury were instructed that, in fixing the compensation to be allowed for the acquiring by the city of the right to use Cape La Croix Creek as an outlet for the sewer system, "you shall be guided by the law concerning the rights of riparian owners in streams, and that law is that a riparian owner, that is, an owner of land adjoining a stream, cannot insist that the water of that stream shall come to him in a natural, pure state, but he must submit to the natural wash and drainage coming from cities and towns, and you are instructed that if you believe and find from the evidence in this case that the plaintiff in the construction of its sewerage system in Sewer District No. 5, according to the plan for same in evidence in this case, will not cause the waters of Cape La Croix Creek to be polluted beyond the extent of their pollution from the

natural wash and drainage going into said Cape La Croix Creek before the opening of said sewer system or rendered more unfit for use than it was prior to the construction of said sewerage system and that said use of said stream will not be of any damage to exceptors' farm, then the exceptors are not entitled to damages on that account, but if you believe and find from the evidence that said sewer system will cause the waters of said Cape La Croix Creek to become more polluted or to be rendered more unfit for use or cause increased damage to exceptors' farm than they are while receiving the natural wash and drainage into said creek prior to the installation of said sewer system, then you may award exceptors such damages as you may think they are entitled to by reason thereof, but you are further instructed to deduct from the total damages you may find will result to exceptors' entire tract of land on account of the construction and maintenance of said sewer system for Sewer District No. 5 in said city, the benefits, if any, peculiar to the whole tract arising from the construction, operation and maintenance of said sewer system.''

By respondent's Instruction 4, the jury were told ''that the burden of proof in this case is on the exceptors to prove, by a preponderance of the evidence, that the tract of land owned by the exceptors will be damaged in excess of the special benefits, if any, that may accrue to it by reason of the construction and maintenance of the sewerage system for Sewer District No. 5 according to the plan for same introduced in evidence in this case.''

By respondent's Instruction 6, the jury were told ''that the exceptors cannot recover damages from the mere fact that Cape La Croix Creek is to be used as a sewer outlet for Sewer District No. 5 of the City of Cape Girardeau and you cannot find for exceptors for damages on that account alone unless you find and believe from the evidence that the waters of said stream will be rendered more unfit for use than they are at the present time.''

314 Mo. Sup.—30.

Respondent's Instruction 7 told the jury "that the City of Cape Girardeau has the same right to use Cape La Croix Creek for its purposes, including the right to use it as a sewer outlet, as has the exceptors to use said stream and the waters thereof for their purposes, subject, however, to the restriction to so exercise the right as to not create a nuisance and to respond in damages in the event the use of same by the city so pollutes the waters of the stream as to deprive the exceptors of the uses of the water they would enjoy were it not for the use of said stream by said city as an outlet for Sewer District No. 5."

Appellants contend that the above quoted instructions, given by the trial court at request of respondent and all of which bear upon the measure of damages, are erroneous because they limit appellants' recovery to actual physical damages and exclude other items of damage, and particularly exclude the depreciation in market value of appellants' farm by reason of the rights herein taken and condemned. Appellants say that the true measure of damages in this proceeding, as in all condemnation proceedings where a part only of an owner's property is taken, as laid down by this court in St. Louis Railway Co. v. Knapp-Stout & Co., 160 Mo. 396, and other cited cases, is "the difference between what was the fair market value of the whole tract or property before, and its fair market value after, the appropriation, in view of the uses to which the land condemned should thereafter be applied."

The trial court, however, gave certain instructions on behalf and at the request of appellants. By one of those instructions the jury were charged that, under the Constitution of this State, private property cannot be taken or damaged for public use without just compensation being paid to the owner and that the city in this proceeding has taken and condemned the following property of appellants: (1) The right to use the strip of land in evidence until January 1, 1924, for the purpose of constructing and maintaining a twenty-one inch sewer

pipe, manholes and appurtenances across said strip of land; (2) a permanent easement or right in said land for said twenty-one inch sewer pipe, manholes and appurtenances; (3) the permanent right to enter upon said land to maintain said 21-inch sewer pipe, manholes and appurtenances, reserving to said landowners the right to use the surface of said land after January 1, 1924, so long as said use does not interfere with or prevent said city from maintaining and repairing said 21-inch sewer pipe, manholes and appurtenances; and (4) the right to use the watercourse of Cape La Croix Creek for a public drain or sewer route, as mentioned and described in evidence. The instruction then proceeds to state the measure of damages for the described property so taken and condemned, as follows: ''In assessing the just compensation and damages, if any, to be paid to these exceptors you should allow them the difference between the fair market value of exceptors' whole tract of property before and its fair market value after the appropriation by the city of Cape Girardeau of the property or rights, uses and easements hereinbefore mentioned and considering the uses to which said condemned property is to be hereafter applied. In determining the amount of compensation or damages to which exceptors are entitled the jury should ascertain, first, the fair market value of the property or the rights, uses and easements actually condemned and taken, and, second, the diminution in value, if any, of the remainder of exceptors' whole farm as the results of the taking of the rights, easements and uses before mentioned, and the total amount found on account of these two items, less the amount of the special or peculiar benefits, if any, resulting to exceptors' land on account of said sewer plan, will be the amount to which exceptors are entitled, and it should be equal to the amount found by you as the decrease, if any, in the fair market value of exceptors' whole property on account of the taking of the rights, uses and easements hereinbefore mentioned.''

By another instruction the term "market value" is specifically defined.

In determining whether the jury were misdirected upon the measure of damages, we think that all of the instructions, including those given on behalf of both respondent and appellants; must be read and considered together as one complete and entire charge to the jury, provided, of course, that they are not misleading, confusing or contradictory. [Chicago Great Western Railroad Co. v. Kemper, 256 Mo. 279.] Let us then examine respondent's several instructions for the purpose of determining whether, in the light of all the instructions given in the case, they can be said to be misleading, confusing or contradictory.

Respondent's Instruction 2 deals with the matter of the damages or compensation to be allowed appellants on account of the taking of certain rights across the described strip of land for the 21-inch sewer main, manholes and appurtenances. In substance it told the jury that they shall award to appellants the reasonable rental value of the land *temporarily* acquired for the time which plaintiff proposed to use it *absolutely*, i. e., from the date of the commissioners' report until January 1, 1924, and (besides) the damages which the jury might find from the evidence will result to appellants' remaining land because of such temporary use. In 20 Corpus Juris, page 740, the rule is thus stated: "Where land is taken, not to be held permanently, but only for temporary use, the measure of compensation is not the market value, but what the property is fairly worth for the time during which it is held, and the same rule applies where property, no part of which is taken, is temporarily injured. The criterion for determining the compensation is held, in some cases, to be the rental value of the property." Our own court seems to have followed the foregoing rule. [Chicago Railway Co. v. McGrew, 104 Mo. 282; St. Louis v. Brown, 155 Mo. 545.] The instruction furthermore told the jury that they should award such further damages as they might find and believe from the evidence will re-

sult to appellants on account of the use by respondent of said strip of land for the construction, maintenance and repair of said 21-inch sewer pipe. We see nothing misleading, confusing or contradictory in this instruction when read with all the instructions in the case.

Respondent's instructions numbered 3, 6 and 7 have to do with the rights acquired by the city to use the natural watercourse, known as Cape La Croix Creek, as an outlet for the sewer system, and deal with the subject of damages resulting from such use. It is alleged in the condemnation petition upon which this proceeding was tried that "the said city finds it necessary in the construction of said sewer to acquire the *natural watercourses or public drains* for outlet purposes as heretofore described," and the evidence adduced shows that Cape La Croix Creek is a *natural or public* watercourse some eleven miles in length flowing through a section of, and within the corporate limits of, Cape Girardeau, and that the junction of Painter Spring Branch with Cape La Croix Creek is within the corporate limits of that city and some distance above appellants' farm, through which Cape La Croix Creek flows on the way to its mouth into the Mississippi River. Therefore, it cannot be well said that appellants are the *absolute* owners of said natural watercourse, for they are merely *riparian* owners and their rights in, and uses of, the waters of said stream are subject to the principles of riparian ownership. As such riparian owners, appellants must endure without remedy such impurities and pollution as find their way into the stream from the natural wash and drainage of a city situated upon its banks and of the lands of other riparian owners within the upper watershed of said stream. [1 Lewis on Eminent Domain (3 Ed.) p. 82, sec. 77.]

In City of Valparaiso v. Hagen, 153 Ind. 337, 341, it is said: "A municipality in large sense is a riparian proprietor. Its officers stand for the corporation. They are empowered by the State to provide and enforce sanitary measures for the preservation of the health and welfare of the public. The corporation has the same right to

exist as an aggregation, and to enjoy its possessions, as a natural person. . . . It may open and improve streets, construct gutters, sluices and waterways, and if storm water carries into these latter the multifarious filth and garbage incident to populous places and bears the same away by natural channels to the general watercourse of the basin, the right of the municipality to permit it will not be doubted, even though the waters of the stream are thereby so polluted as to render them unfit for ordinary uses. And wherein have the dwellers below ground of complaint? They have suffered only that which they should have reasonably expected and estimated in acquiring their property. The question is rooted in the natural law of self-preservation. And if cities are permitted to adulterate streams by allowing all accumulating surface impurities to flow into them by natural channels, we do not perceive why the underlying principles will not allow them to deepen these natural storm channels and transform them into covered sewers, nor why the right to protect the health and welfare of the public against one class of noxious matter should not be extended to all classes of equal virulence. And, while action must be taken with a cautious regard for the rights of those below, it has come to be a scientific fact, generally accepted, that the minimum of mischief resulting from closet contents may be attained by an early dispatch through the medium of flowing water, wherein solids are dissolved and chemical action for purification speedily takes place.''

In Joplin Consolidated Mining Co. v. City of Joplin, 124 Mo. 129, 135, this court has said: ''The proprietor of land through which a stream flows cannot insist that the water shall come to him in the natural, pure state. He must submit, and that, too, without compensation, to the reasonable use of it by the upper proprietors; and he must submit to the natural wash and drainage coming from towns and cities.''

It would therefore seem that, so long as respondent does not make use of Cape La Croix Creek as to de-

prive appellants of their riparian rights in that stream, which they have, subject to the reasonable use of the riparian owners above, including the city of Cape Girardeau, appellants have no claim for compensation or damages. In other words, if the city does not cause the waters of Cape La Croix Creek to be polluted beyond the extent of their pollution from the natural wash and drainage coming from the city and upper proprietors before the opening of the sewer system, or to be rendered more unfit for use than such waters were prior to the construction of the sewer, appellants have no lawful claim for compensation or damages. Ample evidence was offered at the trial tending to show that the waters of the creek were polluted and contaminated by reason of the natural wash and drainage from its watershed from slaughter houses, open cesspools and street or gutter drainage, before the construction and operation of the proposed sewer system. On the other hand, however, the city must respond in damages in the event that its use of the creek so pollutes the waters thereof as to render the same more unfit for use than they were prior to the construction and operation of the sewer system, or so pollutes the stream as to deprive the appellants of the uses of the water they would otherwise reasonably enjoy. This principle is recognized in Joplin Consolidated Mining Co. v. City of Joplin, supra, wherein we said: "But a city has no right to gather its sewage together and cast it into a stream so as to injure the lower proprietor. For damages thus sustained, the lower proprietor will have an action."

We think that respondent's instructions 3, 6 and 7, all of which deal with the proposed uses of Cape La Croix Creek, as a sewer outlet, correctly state the law relating to the rights of riparian owners, and, when read together and when read in conjunction with appellants' own instruction on the measure of damages, they are not confusing or misleading, or contradictory of other instructions in the case. In other words, all of the instructions in the case, when read together as a complete and entire

charge to the jury, furnished a proper guide to the jury on the measure of damages.

Appellants criticize respondent's Instruction 6, because (they say) it assumes that the only possible damage to appellants' farm is by reason of the waters of Cape La Croix Creek being rendered *more unfit for use,* thereby excluding other elements of damage shown in evidence, such as the deposit on appellants' land of sewage, sediments, oils and greases, which will cause odors, leave stains and discolorations, and serve as media for the growth of bacilli. We think that such elements of damage are fairly and reasonably comprehended within the words "more unfit for use" as used in said instruction.

Respondent's Instruction 7 is criticized because it is said to assume that respondent is the owner of a dominant estate, whereas there is no evidence that the city is the owner of a dominant estate. The evidence does show, however, that Cape La Croix Creek flows through the city of Cape Girardeau, and that the natural drainage of a section of that city is into said creek. As said in City of Valparaiso v. Hagen, supra, "a municipality in large sense is a riparian proprietor." We regard the criticism as hypercritical.

Appellants complain of respondent's Instruction 4, wherein the jury were instructed "that the burden of proof in this case is on the exceptors to prove, by a preponderance of the evidence, that the tract of land owned by the exceptors will be damaged in excess of the special benefits, if any, that may accrue to it by reason of the construction and maintenance of the sewerage system." It is asserted that the burden of proof as to damages is on appellants and the burden of proof of special, or peculiar, benefits in on the respondent, and, hence, appellants are not properly required to prove that the damages *exceed* the benefits. If this instruction had been the only one upon the burden of proof, there might be some basis for appellants' contention. However, the trial court gave an instruction on behalf of appellants which

told the jury that "before you can deduct anything from exceptors' damage, if any, for special or peculiar benefits you must first find and believe from the evidence in this case that the remainder of exceptors' property not taken will receive direct and peculiar benefits from the construction of the plan of sewerage for said District No. 5, and by special and peculiar benefits are meant such benefits as are not common or general to other lands in the same community, and you are further instructed that *the burden is upon the city of Cape Girardeau to show by the preponderance or greater weight of the testimony that the special or peculiar benefits, if any, will accrue to the remainder of exceptors' property.*" (Italics ours.) We do not deem the two instructions upon the burden of proof to be contradictory or conflicting. They substantially accord with our ruling in St. Louis, etc., Railway Co. v. Knapp-Stout & Co., 160 Mo. 396. We find no reversible error in the giving of instructions and the assignment must be ruled against appellants.

VII. Appellants' final assignment is that the trial court erred in taxing the costs of the trial against appellants. The statute (Sec. 8363, R. S. 1919), under which this proceeding is had, provides: "The cost of the proceedings shall be paid by the city up to and including the filing and copying of the report of the commissioners, and the court, as to any cost made by subsequent litigation, may make such order as in its discretion may be deemed just." The foregoing special statute is identical with the general statute relating to condemnation proceedings by corporations. [Sec. 1796, R. S. 1919.] Under the latter statute, we held that the taxing of costs after the filing of the commissioners' report rests in the discretion of the trial court, and will not be disturbed unless there is an abuse of discretion. [Chicago Railway Co. v. Elliott, 117 Mo. 549.]

Costs.

We find no reversible error in the record before us. Therefore, the judgment *nisi* must be affirmed, and it is so ordered. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.